463 F.2d 595
 The FIRST NATIONAL BANK OF CROWN POINT, a national banking
association, and the Commercial Bank of Crown
Point, a State of Indiana banking
corporation, Plaintiffs-Appellants,
v.
William B. CAMP, Comptroller of the Currency of the United
States of America, and Mercantile National Bank of
Indiana, a national banking association,
Defendants-Appellees.
 No. 71-1463.
 United States Court of Appeals,
 Seventh Circuit.
 Argued May 17, 1972.
Decided July 7, 1972.
 
 William Carroll, Crown Point, Ind., Fred G. Donnersberger, Hammond, Ind., for plaintiffs-appellants.
 L. Patrick Gray, III, Asst. Atty. Gen., William D. Appler, Walter H. Fleischer, Joseph B. Scott, Attys., Dept. of Justice, Washington, D. C., William C. Lee, U. S. Atty., Fort Wayne, Ind., Timothy P. Galvin, Sr., and Patrick J. Galvin, Hammond, Ind., for defendants-appellees.
 Before SWYGERT, Chief Judge, and KILEY and SPRECHER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 On June 23, 1970, the Comptroller of the Currency of the United States approved an application by the Mercantile National Bank of Indiana for permission to construct a branch bank in an unincorporated area adjacent to the city of Crown Point, Indiana. The appellants in this case, the First National Bank of Crown Point and the Commercial Bank of Crown Point, raised objections to Mercantile's application at the Comptroller's informal hearing on the matter and renewed their objections in an administrative review procedure before the district court. The district court granted summary judgment for the codefendants, Mercantile Bank and the United States Comptroller, and the case is before us on appeal from that decision. We affirm.
 
 
 2
 The National Bank Act, 12 U.S.C. Sec. 36(c), provides that banks may, with the approval of the Comptroller of the Currency, establish branch offices at any location authorized by state law.[1] The Indiana statutory provision applicable to branch bank locations in Lake County, the county in which Mercantile seeks to locate its branch, is Burns' Ind. Stat. Sec. 18-1707. That section provides in part:
 
 
 3
 In all counties having a population of less than five hundred thousand (500,000) inhabitants, according to the last preceding decennial United States census, or in counties having three (3) or more cities of the second class, except as hereinafter otherwise provided, any bank or trust company may open or establish a branch bank in any city or town within the limits of the county in which the principal office of such bank or trust company is located, if there is no bank or trust company located in such city or town.
 
 
 4
 Appellants argue that the area in which the proposed bank was to be located was not a "city or town" within the meaning of section 1707 and that, if it was a "city or town," it was by prior de facto annexation part of the city of Crown Point, and, therefore, an objectionable site for a branch bank because both appellant banks maintain their home offices in Crown Point.
 
 I.
 
 5
 In support of their contention that the district court erred in finding that the proposed site was a "town" within the meaning of the Indiana statute, appellants note that Mercantile's 1967 application for a branch banking site in the same area was denied because the Comptroller found that at that time the area "involved did not possess sufficient viability to be considered a city or town. . . ." Appellants argue that the Comptroller's conclusion that the area had developed sufficiently since that time to be a "town" within the meaning of the statute was arbitrary and capricious. We disagree.
 
 
 6
 A review of the record discloses that substantial development had occurred during the four-year period between 1967 when the first application was denied and 1970 when this application was filed. In 1967, there existed only one 27-unit single-family residential development; a proposal to build a courthouse in Lake County was stalled at the time by litigation which rendered its future uncertain. By 1970, however, the litigation had been successfully concluded, the state legislature had enacted legislation necessary for the project, and a $15 million bond issue to finance the project had been sold.[2] Furthermore, the number of residential units had increased from 27 units to 147 single-family units, with additional construction planned on land recently purchased in the area. Although the appellants challenge the propriety of the Comptroller's consideration of plans for future growth, the Comptroller was not restricted to the physical facts as they existed at the time of the application, but could take into consideration planned development of the area which would affect its character in the foreseeable future. First Citizens Bank & Trust Co. v. Camp, 409 F.2d 1086, 1093 (4th Cir.1969). Thus, taking into account the projected development in the additional 53 square miles encompassed by the 1970 service area and the development expected to be drawn by the location of the new Lake County court-house complex within that area,[3] we believe the Comptroller's conclusion that the area in which the Mercantile wished to establish its branch bank was a "town" within the meaning of the Indiana statute[4] was supported by substantial evidence.
 
 II.
 
 7
 Appellants urge that under Indiana statutes in effect at the time of the 1970 application, the proposed site was in fact a part of the city of Crown Point by virtue of a prior de facto annexation. Although they concede that there was no formal annexation in compliance with Burns Ind.Stat. Sec. 48-701 et seq., they advance several theories in support of their de facto annexation argument.
 
 
 8
 Appellants refer the court to a contract dated July 2, 1965, between the city of Crown Point and the owners of the property now referred to as Wirtz Crown Heights. By this contract, the developers of Wirtz Crown Heights agreed to develop the property according to the "Subdivision Control and Zoning Ordinances of the City of Crown Point" and to seek approval from the Crown Point Plan Commission for all developments in exchange for city water and sewer services. The contract contained a provision under which any rights to object to annexation of the area to the city of Crown Point were waived by the developers.[5] It is argued that this contract represents an alternative method of annexation, expressly countenanced by Burns Ind.Stat. Sec. 53-734, which could be used in place of the strict annexation procedure established by Burns Ind.Stat. Sec. 48-701. Section 53-734,[6] while giving Indiana cities the power to regulate contiguous unincorporated areas within a two-mile radius of the corporate limits, does not, we believe, represent an alternative to the annexation provisions of section 48-701. Section 48-701 is unequivocal in restricting the boundaries of cities and towns to those defined by formal ordinance.[7] Although section 48-701 permits cities to contract with unincorporated areas for municipal services in lieu of annexation,[8] the provision specifies limited periods of time during which any contract may continue in force,[9] and, through a provision permitting the contracting parties to provide that annexation is not to be effected during the term of the contract,[10] specifically delineates between the two procedures. We think it is clear, therefore, that neither section 53-734 nor the contractual provisions of 48-701 provide an alternative to the formal annexation procedures of sections 48-701 et seq. This decision is supported by the opinion of the Indiana Supreme Court in Pittsburgh, C.C. & St. L. Ry. v. City of Anderson, 176 Ind. 16, 18, 95 N.E. 363 (1911), in which the court states:
 
 
 9
 The municipal authorities can in no case alter the boundaries unless the power so to do is conferred upon them by the Legislature; such power, when conferred, must be exercised under the circumstances and in the manner prescribed.
 
 
 10
 Next the appellants argue that Mercantile, by voluntarily seeking to comply with the planning and zoning boards of Crown Point, even though the contract mentioned above had expired and no longer required such compliance, acquiesced to control by the city of Crown Point, and, having done so, could not challenge the validity of the annexation. In support of this theory the appellants cite DePauw Plate-Glass Co. v. City of Alexandria, 152 Ind. 443, 52 N. E. 608 (1899), which held that persons living in annexed territory may, by acquiescence and participation in the benefits conferred by the city, be precluded from disputing the validity of the annexation proceedings. That case, however, is completely inapposite to the instant controversy. De Pauw Plate-Glass involved a taxpayer whose land was erroneously omitted from a legal description of land taken in accord with valid statutory annexation procedures. After accepting the benefits of annexation for three years the taxpayer sought to recover certain taxes which it had paid to the city. Here, as we have stated, there never was an annexation. Surely a voluntary attempt to construct a building consistent with a plan which had formerly been mandatory under the contract but which was no longer in effect does not of itself confer upon the appellants or the city of Crown Point the right to restrict Mercantile's use of its property.
 
 
 11
 Appellants also argue that Burns Ind. Stat. Secs. 26-411 and 26-413, have the effect of extending the boundaries of Crown Point to include the area in question. These sections provide in substance that a court can hold valid court sessions in courthouse facilities located "outside of the corporate limits of a county seat city" and that any business so transacted "shall be deemed to have been transacted and held at and within such county seat city." These provisions do not support the appellants' conclusion; indeed they contradict it. It is precisely because the area in which the new court-house complex was to be located was not a part of Crown Point that the statutes were enacted. As the court below observed, "[T]hey [the statutes] do not purport to do more than they say . . ." and they certainly do not provide an alternative to statutory annexation.
 
 III.
 
 12
 Appellants' final argument is that the district court erred in disposing of this case on a motion for summary judgment. The district court viewed the action as an appeal from an administrative agency determination and applied the standards set forth in the Administrative Procedure Act, 5 U.S.C. Secs. 701-706.
 
 
 13
 It is clear that Congress, having expressly conferred the power to resolve branch banking questions on the Comptroller, intended for the courts to confine their involvement in such questions to a review of his actions. It follows from that conclusion that summary judgment was proper in this proceeding. Ramapo Bank v. Camp, 425 F.2d 333, 347-348 (3d Cir.1970); Ohio Bank & Savings Co. v. Tri-County National Bank, 411 F.2d 801 (6th Cir.1969); Warren Bank v. Camp, 396 F.2d 52, 55-56 (6th Cir.1968). See United States v. Carlo Bianchi & Co., 373 U.S. 709, 714-715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). The question to be resolved in reviewing administrative action is limited to whether the "action of the administrator was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."' Warren Bank, supra, 396 F.2d at 56; 5 U.S.C. Sec. 706(2) (A). It would not have been proper, as the appellants argue, for the district court to have held a de novo hearing into the questions resolved in the administrative proceeding. The district judge's inquiry was limited to determining whether there was substantial basis in the record considered as a whole for the administrator's conclusions.
 
 
 14
 We conclude, therefore, that the record demonstrates a substantial factual basis for the findings of the Comptroller and that those findings were not made arbitrarily or capriciously. The order of the district court is affirmed.
 
 
 15
 Affirmed.
 
 
 
 [1]
 12 U.S.C. Sec. 36(c) states:
 A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.
 
 
 [2]
 The Comptroller based his finding that the area was a "town" in part on his belief that the courthouse would "[p]rovide a nucleus for the generation of new service, business, and commercial establishments."
 
 
 [3]
 In reaching his conclusion, the Comptroller not only considered the evidence of a general population shift from the industrial cities of Hammond and Gary in northern Lake County to residential developments in and around Crown Point, but also had specific evidence of both proposed developments and developments already under construction within the proposed service area
 
 
 [4]
 At the time the Comptroller and district court were asked to interpret the word "town" as used in section 1707, there was no existing Indiana authority interpreting the provision. However, in Pendleton Banking Co. v. Department of Financial Institutions, Ind., 274 N.E.2d 705 (1971), the Indiana Supreme Court dealt specifically with that subject, holding that the word "town" includes "a compact area having a number of persons living in close proximity to one another with some degree of business being transacted within the area." 274 N.E.2d at 708. The court noted that each case would require a factual determination as to whether the area could be considered a town, but that a positive determination was not dependent upon the existence of any number of people or certain facilities. Id
 
 
 [5]
 A similar contract is said to have covered the Fountain Ridge Addition but a copy of that contract is not a part of this record
 
 
 [6]
 Burns Ind.Stat. Sec. 53-734 provides in part:
 A city plan commission shall adopt a master plan for the development of the city and of such contiguous unincorporated area outside the corporate limits of the city as, in the judgment of the commission, bears reasonable relation to the development of the city as it shall designate. Except as limited by the political subdivision boundaries of other cities or states, or by the boundaries of unincorporated areas subject to the jurisdiction of other city plan commissions, such designated contiguous unincorporated area may include all or any part of the area within two miles from the corporate limits of the city. . . .
 
 
 [7]
 The section provides:
 The common council shall have power, by ordinance, to declare and define the entire corporate boundaries of such city, and such ordinances, properly certified, shall be conclusive evidence, in any court or proceeding, of the boundaries of such city. . . .
 
 
 [8]
 The paragraph states, in relevant part:
 The mayor and the proper administrative board with the ratification and approval of the common council shall also have the power, in lieu of annexing any such contiguous territory or in cases not involving any proposed annexation of territory, to enter into contracts with the owners or lessees of designated property in the vicinity of the city, whether within or without county in which the city is located, providing for the payment or contribution of money to the city to be used for such municipal or public purposes as may be specified in such contract. . . .
 
 
 [9]
 The relevant portion of Burns Ind.Stat. Sec. 48-701 states:
 Such contracts may be entered into for such period of time, not exceeding fifteen continuous years under any one such contract, with first and second class cities, and not exceeding four continuous years under any one such contract with third, fourth and fifth class cities. . . .
 
 
 [10]
 Burns Ind.Stat. Sec. 48-701:
 [I]f the contract so provides, during the effective term of any such contract the designated property of such contracting owners or lessees shall not be subject to annexation by the contracting city.