**HEMPSTEAD BANK, Plaintiff-Appellant,**

**v.**

**James E. SMITH, Comptroller of the Currency of the United States and the Chase Manhattan Bank, National Association, Defendants-Appellees.**

**No. 1057, Docket 76–6047.**

United States Court of Appeals, Second Circuit.

Argued May 21, 1976.

Decided Aug. 12, 1976.

Gilbert Henoch, Hempstead, N.Y. (Dalton & Henoch, Hempstead, N.Y., on the brief), for plaintiff-appellant.

Nathaniel L. Gerber, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S.D.N.Y., Taggart D. Adams, Asst. U. S. Atty., New York City, on the brief), for defendant-appellee James E. Smith, Comptroller of the Currency of the United States.

Richard C. Tufaro, New York City (Milbank, Tweed, Hadley & McCloy, and Andrew J. Connick, New York City, on the brief), for defendant-appellee The Chase Manhattan Bank, N.A.

Before LUMBARD, ANDERSON and OAKES, Circuit Judges.

LUMBARD, Circuit Judge: .

Hempstead Bank, a New York state-chartered commercial bank with branches in Nassau and Suffolk Counties, brought this action in the Southern District to set aside as arbitrary and capricious the Comptroller of the Currency's approval of the establishment of a branch of Chase Manhattan Bank, a national bank, in Locust Valley, New York.[1] The district court held that there was an adequate factual basis in the administrative record to support the Comptroller's decision and that it had been made in accordance with New York law that was incorporated by reference into federal law. We find a substantial likelihood that the Comptroller failed to consider the relevant New York law in approving the new branch. We therefore vacate the judgment of the district court with instructions to remand to the Comptroller for further findings.

On August 6, 1974, Chase filed its application for permission to establish a branch banking office in Locust Valley. At the time the application was submitted, the

---

1. Chase is a national banking association and may therefore establish and operate new branches only with the approval of the Comptroller, 12 U.S.C. § 36(c).

area to be serviced by the branch[2] contained 10,150 persons comprising 2200 families with an average annual income of approximately $20,000. Little room remains in the area for further residential development. Chase proposed to locate its branch at a site adjacent to a shopping center in Locust Valley; the branch would thereby serve the same community currently serviced by appellant, the Nassau Trust Company, and a branch of the Prudential Savings Bank of Manhattan.

Hempstead Bank and the Nassau Trust Company filed with the Office of the Comptroller of the Currency protests opposing Chase's application. Hempstead argued that although the average family income of the area was relatively high, projected population growth was minimal. Hempstead contended that the needs of the community were sufficiently served by existing bank branches, the financial condition of which would be impaired by a drain of funds to the new Chase branch. It pointed out that deposits and loans in its own offices had either remained relatively stable or had diminished since 1970. The Regional Administrator of National Banks denied as untimely the Nassau Trust Company's request for a hearing on the matter, but officers of the competing banks were interviewed with respect to the propriety of approving Chase's application.

Unanimous recommendation to approve the application was made to the Comptroller by a Deputy Comptroller, the Chief National Bank Examiner, the Director of the Bank Organization Division, and the Regional Administrator. The recommendation was based on findings that, although future growth in the area would likely be minimal, (1) establishment of the branch would add a competitive factor to the area; (2) the branch would enable Chase to extend its facilities into an area that it did not currently serve; and (3) the area was sufficiently affluent to support the branch without adversely affecting conditions. The Comptroller approved Chase's application on October 10, 1974, without making additional findings.

Hempstead thereafter instituted this action to have the Comptroller's approval declared null and void as having been made in contravention of law. On February 4, 1976, the district court after reviewing the administrative record upon which the Comptroller based his action, *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), held that the Comptroller had complied with the applicable law and that the record supported his decision. The district judge granted summary judgment for the Comptroller and this appeal by Hempstead followed.

Federal law provides that a national bank, such as Chase, may establish branches only under the conditions permitted to state-chartered banks by the law of the state in which it is located. 12 U.S.C. § 36(c).[3] See *First National Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). The purpose of incorporating state standards into federal law is to prevent an institution licensed by one governmental entity from expanding into a geographical area forbidden to competing banks licensed by another entity and thereby to maintain competitive equality between state-chartered and federal-chartered banks. See *First National Bank of Logan v. Walker Bank & Trust Co., supra,* 385 U.S. at 258–61, 87 S.Ct. 492. To effectuate this purpose, courts have consistently held that in determining whether to approve branch applications from national banks, the Comptroller not only must con-

---

**2.** In determining whether to approve branches of national banks, the Comptroller considers the General Service Area, a functional term describing the area from which the branch expects to generate at least 75% of its loans and deposits.

**3.** 12 U.S.C. § 36(c) provides that national banks may establish new branches "at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively . . . and subject to the restrictions as to location imposed by the law of the State on State banks."

sider whether the relevant state allows branching in some form, but must also, in each case, make such specific findings as are required by state law. See, e. g., *First National Bank of Logan v. Walker Bank & Trust Co., supra,* 385 U.S. at 261–62, 87 S.Ct. 492; *First Bank and Trust Co. v. Smith,* 509 F.2d 663 (1st Cir. 1975); *First National Bank of Catawba County v. Wachovia Bank and Trust Co.,* 448 F.2d 637 (4th Cir. 1971); *First-Citizens Bank and Trust Co. v. Camp,* 409 F.2d 1086 (4th Cir. 1969).

■ In determining whether state standards have been satisfied, the Comptroller need not conduct formal hearings or make detailed findings. Nor may his judgment be questioned in a de novo hearing in the district court; any review is limited to the question of whether the decision was arbitrary, capricious or not in accordance with law in light of the administrative record. *Camp v. Pitts, supra.* The Comptroller's findings, however, must be adequate to allow for meaningful judicial review. See *Camp v. Pitts, supra,* 411 U.S. at 142–43, 93 S.Ct. 1241.

■ In the present case, the Comptroller was required to determine the validity of Chase's application in accordance with the law of New York, which provides that a branch office may be authorized if it is found "upon investigation that the public convenience and advantage will be promoted by the opening of such branch office . . . ." N.Y. Banking Law § 29 (McKinney 1971). Although this language is general and leaves ample room for discretion, presumably it requires that a branch should be established in an area only if the banking structure in the community to be serviced is not adversely affected and that the public will thereby be better served.[4] The administrative record before us allows for substantial doubt whether this criterion was properly considered by the Comptroller.

See *City National Bank v. Smith,* 168 U.S. App.D.C. 221, 513 F.2d 479, 485 (1975).

■ Throughout the record there are references to the benefits that will accrue to Chase if it is permitted to establish its proposed branch. Thus the National Bank Examiner and the Regional Administrator of National Banks found that "establishment of the branch would enable the bank to extend its facilities into an area not currently serviced by the applicant," and the Deputy Comptroller concluded, "[t]his is a lucrative market in which applicant is not represented." We do not doubt the validity of these findings, but since the public's advantage may well not be identical to Chase's advantage, we consider the increased opportunities for the applicant's expansion irrelevant to the standards by which the Comptroller was required to evaluate the application. The paramount consideration is the public interest and not the private interest of a very large banking institution which seeks to grow larger.

■ Nor is the fact that the new branch would add a competitive factor to the area sufficient to show that the Comptroller has properly evaluated "the public convenience and advantage" as that phrase is used in § 29. While the Comptroller need not make explicit findings of fact, the record may not be so paltry and conclusory as to frustrate effective judicial review. 411 U.S. at 142–43, 93 S.Ct. 1241. The tautological statement that a new branch would add to competition in the area, unsupported even by a conclusion that additional competition is necessary or would promote the public interest, provides no basis for judicial analysis of the reasonableness of the Comptroller's approval of the application. On remand, reliance on competition becomes all the more doubtful, as the New York legislature has recently enacted a law permitting savings banks such as Prudential, which has a branch in the area, to offer checking accounts, a factor that may affect competi-

---

**4.** This seems to be a logical reading of the statute, not inconsistent with state court decisions regarding § 29. See *Tooker v. Albright,* 71 Misc.2d 619, 336 N.Y.S.2d 278 (Sup.Ct.

1972); *Franklin National Bank v. Superintendent of Banks,* 40 Misc.2d 565, 243 N.Y.S.2d 507 (Sup.Ct.1963); *State Bank of Kenmore v. Bell,* 197 Misc. 97, 96 N.Y.S.2d 851 (Sup.Ct.1949).

tion in Locust Valley without the addition of another bank branch. See 1976 Laws of New York, 199th Session Ch. 225.

We do not accept the proposition, urged by the Comptroller, that additional competition per se promotes the public convenience and advantage and that therefore consideration of the New York standard is implicit in the Comptroller's findings. Those cases that suggest that additional competition is synonymous with the public good concern the need to prevent monopolistic or oligopolistic conditions within the banking community. See *United States v. Phillipsburg National Bank and Trust Co.,* 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Clermont National Bank v. Citizensbank National Association,* 329 F.Supp. 1331, 1339–45 (S.D.Ohio 1971). In this instance, however, the record contains no allegation or evidence of the need for or desirability of additional competition. Indeed, the paucity of supporting evidence or opinion in the present record, where the conclusion that "a competitive factor" will be added stands alone, is best exemplified by comparison with the record in *Clermont, supra,* where the Comptroller found:

> "It is evident that Clermont National Bank with resources of $43.9 million and operating eight offices, substantially dominates commercial banking within Clermont County.
>
> \*   \*   \*   \*   \*   \*
>
> "In my opinion, an extremely unhealthy competitive situation presently exists and a strong public need is evident within the Milford area for a banking alternate to Clermont National \* \* \* Approval will bring about competition \* \* \* Introduction of competition is needed and would clearly be in the public interest."

329 F.Supp. at 1340. The findings in that case, although conclusory, set forth the determinative reason for the Comptroller's decision and were sufficient to permit a reviewing court to determine whether the findings were sustainable on the administrative record. See *Camp v. Pitts, supra,*

411 U.S. at 143, 93 S.Ct. 1241. In the instant case, no findings, conclusory, informal or otherwise, inform us of the propriety of adding competition in the Locust Valley banking community. The most that one can find in the record is a description, without comment, of the amount of deposits held and loans made by competing banks. Articulation of the Comptroller's reasons for his decision is especially necessary with respect to competition, since, as the Comptroller implied in denying a branch application in *Camp v. Pitts, supra,* a surfeit of banks in one area may be as detrimental to the public as is a monopoly. Therefore, in the absence of any discussion or finding by the Comptroller concerning the adequacy of competition in the existing banking community, we find inadequate consideration of the public convenience and advantage from the summary statement in the present record.

An additional rationale for granting Chase's application appears to have been the belief that the community to be serviced was sufficiently affluent to support the proposed branch "without causing greatly adverse conditions." The quoted phrase suggests that the Comptroller's staff was aware that some drain of funds from existing banks to a new branch would occur. Thorough analysis of that possibility would seem to have been essential to a proper determination of whether Chase's presence in Locust Valley would promote the public advantage. The record, however, reveals that the staff fluctuated in its concern over this problem. The National Bank Examiner, in a report also signed by the Regional Administrator, found that the complaints of Hempstead and Nassau that their deposits had remained stable or declined in recent years, and thus that they could not afford additional cash drain, "may have some merit." Nevertheless, in a report signed only by the Regional Administrator, these same objections were summarily dismissed as having "little merit." Despite the existence of this apparent inconsistency, there does not appear to have been any sort of "investigation," required by § 29, to resolve the

complaints of the protesting banks and reconcile them with the "public advantage."[5]

The absence of any express findings of public convenience and advantage and our inability to discover consideration of that criterion implicit in the record[6] strongly suggest that the Comptroller's action was not taken "in accordance with law." 5 U.S.C. § 706(2)(A). We conclude, therefore, that we must remand this case so that the Comptroller can provide adequate explanation of his investigation of the applicant's satisfaction of New York's branching requirements.

Finally, we need not and do not consider Hempstead's contention that the Comptroller also erred in not complying with the regulations of the New York State Banking Board which would have required a higher ratio of population to banks in the area before approving the proposed Chase branch. Since that regulation was repealed effective January 1, 1975, and since we must apply the law in effect at the time we render our decision, *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), no effect may now be given to the repealed regulation.

Vacated and remanded.

---

**5.** The only unfavorable factor mentioned in the staff recommendations to the Comptroller is that the future growth of the area appears to be minimal. In previous cases, the Comptroller has relied on the probability of substantial future growth in an area to support his approval of new branches. See *First National Bank of Fayetteville v. Smith,* 508 F.2d 1371, 1376 (8th Cir. 1974), cert. denied, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975); *First-Citizens Bank and Trust Co. v. Camp,* 409 F.2d 1086, 1093 (4th Cir. 1969).

**6.** For a provocative exchange concerning the specificity with which the Comptroller must express his findings and the role of the judiciary in reviewing those findings, see Scott, In Quest of Reason: The Licensing Decisions of the Federal Banking Agencies, 42 U.Chi.L.Rev. 235 (1975) and Murphy, What Reason for the Quest?: A Response to Professor Scott, 42 U.Chi.L.Rev. (1975).