**FIRST UNION BANK AND TRUST COMPANY OF WINAMAC, INDIANA, Plaintiff-Appellant,**

v.

**John G. HEIMANN, Comptroller of the Currency and First National Bank of Monterey, Defendants-Appellees.**

No. 78–1487.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1978.

Decided June 15, 1979.

William F. Welch, Indianapolis, Ind., for plaintiff-appellant.

Gary L. Ryan, Litigation Div., Comptroller of the Currency, Administrator of the National Banks, Washington, D. C., James B. Meyer, Schererville, Ind., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and WHELAN, Senior District Judge.*

* Central District of California is sitting by designation.

PELL, Circuit Judge.

The plaintiff-appellant, First Union Bank of Winamac, Indiana, (Winamac Bank) brought this action in the district court for declaratory and injunctive relief, seeking to have set aside an order by the defendant Comptroller of the Currency. The order at issue approved the establishment of a branch bank by the defendant First National Bank of Monterey (Monterey Bank) on the east side of U.S. Highway 35 north of Winamac, Indiana. The district court entered summary judgment in favor of the defendants, and the plaintiff Winamac Bank appeals. To decide this case we must determine whether the Comptroller's decision that the proposed site of the branch facility was a "town" within the meaning of the Indiana branch banking law, Ind.Code § 28–1–17–1, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

The statutory background of this case is not complex. According to federal banking law, state law governs the ability of national banks to establish branches. The Comptroller of the Currency may not approve a national bank branch if state law prerequisites are not satisfied. 12 U.S.C. § 36(c); *First National Bank of Logan v. Walker* *Bank & Trust,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966).[1] The standard applicable to this case is set by Indiana law, which permits banks to open a branch if the branch is within the same county where the bank maintains its principal office, if the branch is in a city or town, and no other bank is located in the city or town.[2] Only the requirement that the branch be located in a "city" or "town" is at issue here. The Comptroller determined that the proposed site of the Monterey Bank branch was a "town." The plaintiff argues vigorously that this determination is contrary to Indiana law.

The proposed site of the Monterey Bank branch is approximately one-eighth mile north of the corporate boundaries of Winamac, Indiana, on the east side of U.S. Highway 35.[3] Also on the east side of the highway, approximately one-quarter mile to the north of the site,[4] is a nursery or garden center. This nursery is the closest business to the proposed branch that is not within the corporate limits of Winamac.[5] A veterinary clinic is located approximately one-quarter mile to the north of the nursery and is also on the east side of U.S. 35. On the west side of U.S. 35, approximately one-half mile to the north of the site, is a

1. 12 U.S.C. § 36(c) provides in pertinent part: A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: . . . (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. . . .

2. This standard appears in Ind.Code § 28–1–17–1 which provides in pertinent part:
   [A]ny bank or trust company may open or establish a branch bank in any city or town within the limits of the county in which the principal office of such bank or trust company is located, if there is no bank or trust company located in such city or town.

3. The record shows that Winamac, Indiana has a population of approximately 2500, approximately 980 residences, over 35 retail stores, 4 schools, 8 churches and some industry. It also has a police department, a fire department, and a hospital.

4. The plaintiff-appellant's affidavit evidence below described this distance as ½ mile. The Comptroller's opinion, however, indicates that he relied on the distances shown by a map of Winamac and surrounding areas, which was also in evidence, and which shows a smaller distance between the site and surrounding development.

5. The Comptroller's opinion mentions another business, the "Swirly Top" drive-in restaurant, which is also on the east side of U.S. 35, directly to the south of the branch site. Except for a portion of its lot, however, this establishment lies within the corporate boundaries of Winamac, and cannot be considered as a business establishment in the area containing the branch site for purposes of determining whether the area is a town separate from Winamac. According to the local building inspector, the "Swirly Top" building lies entirely within the Winamac corporate boundaries.

farm supply store. Slightly to the north of the supply store on the west side of the highway is a cattle lot. In the area along U.S. 35 north of the corporate boundaries of Winamac, these are the only business establishments within one-half mile of the site.[6]

Also along the highway in the vicinity of the branch site are twenty-five houses with a population of approximately thirty-eight people, eight of whom are minors.[7] The area surrounding the site is not incorporated, nor does it have a name.

■■■ We begin our discussion by noting that judicial review of the Comptroller's decision is governed by the APA, 5 U.S.C. § 706(2)(A). We must determine whether the Comptroller's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). We must not set aside the Comptroller's determination if it has a rational basis in the record. *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 419–20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The history of these

proceedings, however, is somewhat unusual, and the course of the proceedings affects our review. After Winamac Bank brought this action for review of the Comptroller's decision, the district court remanded the case to the agency with directions to reopen the administrative record on the issue whether the proposed branch would be located in a "town" within the meaning of the Indiana statute and to make a written record of the Comptroller's conclusions and the legal basis for those conclusions. This procedure was the proper one for the court to follow when the Comptroller's explanation of its action is inadequate for judicial review. *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Hempstead Bank v. Smith,* 540 F.2d 57, 58 (2d Cir. 1976); *Central Bank v. Smith,* 532 F.2d 37, 40 (7th Cir. 1976). After consideration of written supplementary materials of the parties, the Comptroller issued a written opinion, explaining why the proposed site satisfied the "town" requirement of Indiana law.[8] Although our review of the Comp-

**6.** In fact the President of the Monterey Bank testified that the only other local businesses along U.S. Highway 35 north of Winamac are an airport, approximately 1½ miles to the north of the site, and, farther to the north, a fish and game preserve, a state park, and a campground. In nearby Beardstown, Indiana, are a grocery store and a gas station.

**7.** The plaintiff argues that the area contains 20 houses. We find it virtually impossible to determine from the enlarged map submitted to this court by the Comptroller how the Comptroller reached the figure of 25 residences. We shall assume arguendo, that this finding has support in the record, because the difference between 20 and 25 houses is not material to the outcome of this case. The defendants also argued below that 38 is a "patently absurd" population figure for 25 residences. Other than this conclusory remark, however, no evidence was offered to show a significantly larger population.

**8.** The portion of the Comptroller's opinion dealing directly with the proposed site said:

Although there is some dispute as to the exact distance of First National's proposed branch from the boundary of the incorporated town of Winamac, both First National and First Union agree that the proposed office will be located outside the incorporated municipality. At the time of First National's

application, there were twenty residences in the vicinity of the proposed branch site. Supplemental information indicates that there are now twenty-five residences within one-half mile of that site. These residences form a linear cluster along the west side of U.S. Highway 35 north of the corporate limits of Winamac.

In addition to the residential concentration, there are at least four commercial establishments within the linear cluster: a veterinarian, a garden center, a farm supplier, and a stockyard. A fifth commercial establishment apparently straddles the corporate line so that the lot upon which it is situated lies partly within and partly without the corporate boundary.

The supplemental information provided by First National and First Union reveals a dispute as to future development in the area. First National has supplied materials which indicate that the owner of a tract of land along U.S. Highway 35 is in the process of developing his property and has made initial contact with several enterprises in this regard. The materials furnished by First Union indicate that, at this time, there are no definite plans or commitments on the part of any of these enterprises to locate in the area and that the development plans are, at best, in their initial stages. Assuming that the developer's plans ultimately reach fruition, the lin-

troller's decision would be impossible without it, the explanation before us is to some extent a post hoc rationalization, having been prepared during the course of the litigation, and must be viewed critically. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[9]

We shall now examine the Comptroller's decision with that caveat in mind. The Comptroller's opinion properly considers the three cases in which the definition of "town" under the Indiana branch law is discussed, *First National Bank of Crown Point v. Camp,* 463 F.2d 595 (7th Cir. 1972); *Pendleton Banking Co. v. Department of Financial Institutions,* 257 Ind. 363, 274 N.E.2d 705 (1971); and *Albion National Bank v. Department of Financial Institutions,* 355 N.E.2d 873 (Ind.App.1976).

In *Pendleton,* the Indiana Supreme Court affirmed the determination by the Indiana Department of Financial Institutions that Huntsville, Indiana, was a town, emphasizing that Huntsville had several businesses and a rapidly growing population of 250 or more. In *Pendleton* the court described a town for purposes of the Indiana branch bank law as "a compact area having a number of persons living in close proximity to one another with some degree of business being transacted within the area." 274 N.E.2d at 708.

This definition of the word "town" was repeated by this court in *First National Bank of Crown Point v. Camp,* 463 F.2d 595, 597 n.4 (7th Cir. 1972). In *Crown Point* this court affirmed the Comptroller's determination that an area along a highway containing two or three houses, a retail complex, a saddle club, a veterinarian, and a church was a town for branch banking purposes, although there was an industrial complex one mile to the east, a housing development and restaurant 1.1 miles to the northwest, and a shopping center and mobile home park 1.1 miles to the south.

■ On the basis of these decisions the Comptroller properly observed that the question whether a site is in a town is for case-by-case determination. Furthermore, the Comptroller properly rejected the notion that "there is a fixed population or number of commercial enterprises which establish minimum requirements for the existence of a 'town.'" Even under this flexible standard, however, the record in this case supplies no rational basis for the Comptroller's conclusion that the site of this branch is in a town within the meaning of the Indiana branch banking law. The decision of the Comptroller must therefore be set aside.

■ The Indiana branch banking statute uses "town" in its ordinary sense. Ind.Code § 1-1-4-1, First; *Pendleton, supra.* The word "town" denotes an area which serves to some extent as a hub for surrounding communities, that is, a population and commercial center. Thus, it need not be incorporated or have a name, *id.,* but it at least should have a separate identity. From its use of this term, it is apparent that the Indiana legislature intended to impose a general minimum standard for the type of community that it believed could support a branch facility. This qualitative definition of a town as a center of population and commerce sets the limits on what courts have called a "town," not raw numbers of businesses and people. Furthermore, in re-

---

ear concentration along U.S. Highway 35 will include a bowling alley, Pizza Hut, beauty shop, and home improvement store. As of the filing of the supplemental information, however, no building permits or zoning variances permitting this development had been issued.

(Footnotes omitted).

The opinion also contains a discussion of the relevant cases which we have not quoted here.

**9.** The plaintiff argues that participation of agency litigation counsel in the Comptroller's

decision on remand denied it an impartial arbiter and therefore constitutes arbitrary action. We disagree. The plaintiff was not entitled to the protections inherent in formal adjudicatory proceedings. Furthermore, we read the passage from *Overton Park* cited in the text, *supra,* as an anticipation of this argument, and conclude that participation by agency litigation counsel in the remand proceedings merely should result in critical examination by the reviewing court, but certainly does not in itself require reversal.

stricting branches to towns where another bank is not already located, the legislature has expressed opposition to the use of branch banks as a means of competition:

> The policy which seems to underlie the Indiana statute is that creation of a branch bank is desirable or· justifiable as a means of establishing a new local banking facility in a municipality not already so served, but not desirable or justifiable as a means of promoting competition in a municipality where one or more banks are already located.

*Marion National Bank v. Van Buren Bank,* 418 F.2d 121, 124 (7th Cir. 1969). We must guard against a definition of "town" that would subvert these policies.

The cases cited by the Comptroller for the applicable standard incorporate these qualitative elements of the definition of "town." In *Pendleton,* the Indiana Supreme Court had before it a specific finding that Huntsville, Indiana, was an identifiable community separate from the town of Pendleton. 274 N.E.2d at 709. In *Albion,* the Indiana Department of Financial Institutions referred to the proposed branch site as "a center of business, social, economic and educational activity".[10]  355 N.E.2d at 876. Similarly, in *Crown Point,* this court affirmed the Comptroller's decision, which was based in part on the characterization of the courthouse complex as a "nucleus" for the generation of new service, business, and commercial establishments. 463 F.2d at 597 n.2.

■ In contrast, the record before the Comptroller contains no basis for the conclusion that the area in question has an identity separate from Winamac or that it serves as a commercial or population center. In fact the record in this case compels the conclusion that placement of the branch at the proposed site would subvert the purpose of the Indiana statute, which would forbid location of the branch in Winamac. We cannot say that twenty-five residences would never be adequate to constitute a town. The area at issue here, however, has

only four businesses, all of which specialize in serving agricultural needs. The area does not contain one establishment to serve the daily needs of the general population in the immediate area, such as a grocery store, a gas station, a drug store, a post office, a courthouse, a hospital, or an industrial or shopping center employing a number of area residents. We do not imply that the area must contain any specific type of business. Neither the tiny population nor the small and specialized commercial community, however, would attract sufficient traffic from surrounding areas to warrant a finding that the site serves as a hub for the surrounding area, or, more specifically, a finding that the area would provide any support for a full-service branch facility.

■ We do not mean that Indiana law forbids the creation of a branch that would receive support from more than one town. If the branch site at issue here could fairly be considered a town, the fact that it also served Winamac would not make any difference. *See Pendleton, supra.* We recognize that the Comptroller uses sophisticated measurement techniques to determine potential support for a branch bank, and Indiana law certainly does not preclude use of these techniques. The Comptroller, however, must not use these techniques as a complete substitute for the judgment of the Indiana legislature that a branch should be located in an area sufficiently populous and commercialized to be called a town. Thus, even if the Comptroller determined that a branch located along an empty stretch of highway would draw sufficient business to ensure success from surrounding areas, the Comptroller would nevertheless have to disapprove the branch because it is not located in a town. *See Albion, supra.*

■ We recognize that future development is a relevant consideration in determining whether an area is a town. *See Crown Point, supra.* The record before us includes some controversy about future development of the area containing the

---

**10.** Although the court in *Albion,* applying *Pendleton,* reversed the Department on the application of the standard to the facts, it did not question the standard itself.

branch site. The Comptroller's opinion mentions this development, but, as we read it, rejects it as a ground for approving the branch and relies solely on the present character of the area. We note, however, that consideration of future development would not have supplied a basis for the Comptroller's decision. None of the developments mentioned in the Comptroller's opinion was sufficiently certain to be established to serve as a basis for finding the area to be a town. These developments were mentioned only in the affidavit of the owner of the parcel of land upon which the proposed branch would be located. As the Comptroller recognized, no building permits had been issued. No zoning variances had been requested or granted. Furthermore, the affidavit of Dennis Gilman, the owner of the beauty shop allegedly proposed for the area, directly rebuts the assertion in the other affidavit that a shop would be located in this area. A letter from Dora Fitz, owner of a 114 acre tract of land adjacent to the site, also contradicts the affidavit, disclaiming any intent to subdivide the tract, which is now used for farming.

Even if the record provided some evidence for the conclusion that the area north of Winamac is a town, we would still doubt the validity of the Comptroller's action. The record contains evidence that the applicant chose this site for the purpose of avoiding the restriction of Indiana law which would not let it do business in Winamac by means of a branch. An aerial photograph of the area in which the site is located shows no natural boundaries between the site and Winamac. The Winamac boundary is merely an arbitrary line drawn through an area of scattered buildings. *Cf. Pendleton, supra*, 274 N.E.2d at 709 (noting that "aerial photographs . . . show a clear demarcation" between the towns of Pendleton and Huntsville, Indiana). The application of Monterey Bank never refers to the actual site of the branch except when asked for the precise location. The president of the Monterey Bank testified at the agency hearing about the area north of Winamac, but never indicated that the bank considered the area a town with an identity separate from Winamac, with a population and commercial activity within its boundaries that would provide support for the branch. In fact, the president had to be reminded at one point during his testimony that the area contained a cattle lot, one of the four businesses the Comptroller relies on in his opinion. When the application requested a comment on the "economic character of the area to be served," Monterey Bank described Winamac—its industry, its residential population, and its retail establishments. The actual site is only briefly described in the section as containing a farm store, a veterinary clinic, and a drive-in,[11] again without mentioning the cattle lot. Exhibits at the agency hearing consisted of petitions signed by area residents and letters from local businesses urging approval of a branch bank in the Winamac area. Most notably, the Monterey Bank President testified:

> So, finally, we just felt that the opportunity was right to move to Winamac, and the last two examiners which we have had, . . . have both indicated that they thought it would be a good move, and after I suggested to them this last time—well, they saw it in the records where they have applied for a branch.

To conclude on the basis of this record that the site of this branch was a "town" with an identity separate from Winamac, the Comptroller had to ignore the common sense meaning of the word. It is impossible for us to believe that the Indiana legislature intended the term to be defined in the disjointed manner of the Comptroller's opinion:

> It is clear, therefore, that a "town" is a single compact area, regardless of proximity to an incorporated municipality, having a number of persons living in close proximity to one another in something more than three houses, with some

---

11. We have already noted that the drive-in restaurant lay primarily within the Winamac corporate boundaries.

degree of business being transacted within the area, and such "town" need not resemble any other "town" with respect to population or commercial activity. In addition, one may look to the future and take into account proposed developments, both commercial and residential, when determining whether a particular area is a "town."

The Comptroller's opinion merely incorporated the facts of the cases decided under the Indiana statute, failing to recognize that the legislature had any purpose whatsoever in inserting the word "town." As a result, the term, as applied by the Comptroller, is virtually meaningless.

In conclusion, we note that the applicant submitted in its supplementary statement before the agency that "[t]he failure to grant approval to this application would tend to maintain a strong economic monopoly presently in force. . . . The American free-enterprise system was not built upon this philosophy." The evidence in the record also shows a prevailing attitude in the Winamac community that it would be desirable to "shop" for the best banking services. The Comptroller apparently agrees with this philosophy and approved the application at least partly for this reason.

Congress, however, has not entrusted the Comptroller with the power to make policy on the subject of branch banking. The policymaking role in this area is given to the state legislatures. The Indiana legislature has determined that it is not prudent to promote competition among banks by means of branches. If the people of Indiana wish to encourage the use of branch banks, the simple answer is to see to it that the General Assembly of Indiana takes appropriate action. Recourse should not be to the courts or the administrative agencies to liberalize the law. For the Comptroller of the Currency to relax these branching standards for national banks would place state banks in a disadvantageous position relative to national banks. This result would subvert Congress' longstanding policy of "competitive equality" embodied in section 36(c)

of the federal banking law. *First National Bank v. Walker Bank & Trust,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); *Marion National Bank v. Van Buren Bank,* 418 F.2d 121, 123–24 (7th Cir. 1969). Accordingly, the judgment of the district court is reversed.

REVERSED.