STATE BANK OF RENSSELAER, Plaintiff-Appellant,

v.

John G. HEIMANN, Comptroller of the Currency, and the Farmers National Bank of Remington, Defendants-Appellees.

No. 79–1262.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1980.

Decided April 23, 1980.

---

Jonathan L. Birge, Indianapolis, Ind., for plaintiff-appellant.

Lise S. Haupt, Washington, D. C., for defendants-appellees.

Before SWYGERT, PELL, and TONE, Circuit Judges.

PELL, Circuit Judge.

The determinative issue in this appeal is whether the decision of the defendant Comptroller of the Currency to authorize the opening of a branch bank facility at a site adjacent to Rensselaer, Indiana, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Specifically, we have been asked to review the Comptroller's decision that the site of the branch is "in a town" within the meaning of the Indiana branch bank law. Ind. Code § 28–1–17–1.

In July 1977, the Farmers National Bank of Remington (Remington Bank) applied to the Comptroller of the Currency, seeking approval of its plans to open a branch bank just south of the city limits of Rensselaer, Indiana, and north of the campus of St. Joseph's College. The Comptroller held a hearing and approved the application in June 1978. The plaintiff, State Bank of Rensselaer (State Bank), brought this action in the district court against the Comptroller and Remington Bank; seeking declaratory and injunctive relief from the Comptroller's decision. The district court granted the defendants' motion for summary judgment. State Bank appeals from the judgment.

State Bank's argument on appeal is that placement of the Remington Bank branch on its present site violates the federal branch bank law, 12 U.S.C. § 36(c).[1] The federal statute permits the Comptroller to authorize a national bank branch only if a state statute authorizes branching by state banks and, if so, subject to the same restrictions as state banks. The Indiana branch banking restriction at issue in this appeal permits branch banks to be located "in a

1. The federal statute provides in pertinent part:
   A national banking association may, with the approval of the Comptroller . . . establish . . . new branches . . . at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

city or town" where no other bank or trust company is located.[2] Rensselaer Bank argues that there is no basis in the record for the Comptroller's conclusion that the site of this branch complies with this requirement.[3]

As it is used in the Indiana statute, the word "town" is intended to have its ordinary meaning. Ind.Code § 1–1–4–1; *Pendleton Banking Co. v. Department of Financial Institutions*, 257 Ind. 363, 274 N.E.2d 705 (1971). The Indiana Supreme Court has defined a town as "a compact area having a number of persons living in close proximity to one another with some degree of business being transacted within the area." *Id.*, 274 N.E.2d at 708. The Indiana Court of Appeals has indicated that a town is a ". . . center of business, social, economic and educational activity. . . ." *See Albion National Bank v. Department of Financial Institutions*, 355 N.E.2d 873, 876 (Ind.App.1976). In *First Union Bank & Trust Co. v. Heimann*, 600 F.2d 91 (7th Cir. 1979), *cert. denied*, 444 U.S. 950, 100 S.Ct. 423, 62 L.Ed.2d 320, we noted that the policy behind the statute is that branch banks are not a desirable means of promoting competition, but are justifiably used to establish a new local banking facility in an area not already served. *Id.* at 97 (*quoting Marion National Bank v. Van Buren Bank*, 418 F.2d 121, 124 (7th Cir. 1969)). On that basis we concluded that the word "town" imposes a general minimum standard for the type of community that the Indiana legislature believed could support a branch facility. *Id.* at 96.

Mindful of these standards, we turn to the record to determine whether the Comptroller had any basis for determining that the site of this branch is located in a town. The proposed site is located on the west side of Highway 231, abutting the south corporate line of Rensselaer, Indiana. Approximately 900 to 1000 feet south of the bank is the entrance to the campus of St. Joseph's College. This unincorporated area appears in Indiana state highway maps as "Collegeville." St. Joseph's College has an enrollment of approximately 1000 students and a faculty of 80. Most of the students live in dormitories on campus. The dormitory closest to the branch site is 2350 feet away. The campus has, in addition to classroom buildings and dormitories, a power plant, a student center, a cafeteria, and a chapel. There is also a Rensselaer post office branch used only to route mail to college students, faculty, and staff. No deliveries are made from this office. The proposed site is not served by this post office branch. Letters addressed to the proposed branch in "Collegeville," however, have been delivered to the branch. The campus also has a dry-cleaning pick-up station for student use only. Along Highway 135 between the branch site and the campus are the college athletic field, the field house, and the baseball field. Most of the other land surrounding the branch is owned and farmed by the college. Two housing subdivisions lie approximately one mile south of the campus. Together they contain approximately sixty houses. The Rensselaer Ready Mix cement plant, a mile to the southwest of the site, employs eight to twelve people. A twenty-five unit motel lies farther to the south. No further development is currently planned.

We note some ambiguity in the Comptroller's record about the exact boundaries of "Collegeville." We are not convinced that the Comptroller seriously considered the motel and the cement plant or the subdivisions to be a part of the proposed town. In his Memorandum to the Comptroller on this issue, a clerk in the Legal Services Division alluded to the presence of the businesses

---

**2.** Ind.Code § 28–1–17–1 provides in pertinent part:

> [A]ny bank or trust company may open or establish a branch bank in any city or town within the limits of the county in which the principal office of such bank or trust company is located, if there is no bank or trust company located in such city or town.

**3.** Because of our disposition of the case on this issue, we need not reach Rensselaer Bank's alternative argument for reversal based on the alleged failure of the Comptroller to make findings on the issue of safety of the proposed drive-in facility.

and subdivisions, but the Summary and Recommendation of the Regional Director for Corporate Activities describes Collegeville as "basically confined to the 130 acre campus of St. Joseph's College." We do not consider the inclusion or exclusion of the two businesses in issue to be material to the outcome because neither business is the sort that will "serve the daily needs of the general population in the immediate area. . . ." *See First Union Bank & Trust, supra*, 600 F.2d at 97. Furthermore, we have concluded that the inclusion of the subdivisions is forbidden by the requirement of *Albion National Bank, supra*, that the area of a town be compact; the inclusion of both the subdivisions and the campus creates two clusters of activity, approximately one mile apart, with little or no interaction or nexus between the two. Most of the college students live on campus, and the record does not show that the subdivisions have any other substantial connection to the college. There was also during the course of the litigation some reliance upon the branch site being just south of a shopping plaza. These facilities, however, are located within the corporate limits of Rensselaer and are no basis for determination of the issue here presented. *See First Union Bank & Trust, supra*, 600 F.2d at 94, n.5.

Limiting our consideration of the "town" issue to the college campus, we have severe doubts about whether the campus alone qualifies as a "town" under Indiana law. The student population is not permanent, but perhaps generates some banking business in the form of small accounts and loans. The record does show that Remington Bank had a substantial student loan business in comparison to the Rensselaer banks. The private business activity on the campus, however, is negligible, although the college employs a number of people, thereby generating additional banking business.

Regardless of whether the campus is itself a town, however, the record indicates that the intent of the Remington Bank and the Comptroller was to open a branch bank that was, for all practical purposes, located in Rensselaer, not Collegeville, and certainly to serve the residents of Rensselaer. Location of a branch bank in Rensselaer is forbidden by Indiana law, and a contrivance to evade that restriction similarly cannot stand. *See First Union Bank & Trust, supra*, 600 F.2d at 96; *Marion National Bank v. Van Buren Bank*, 418 F.2d 121, 124 (7th Cir. 1969).

Section 36(c) gives state legislatures, not the Comptroller, the power to determine the proper use of branch banks, or whether they should be used at all. *First Union Bank & Trust, supra*, 600 F.2d at 99. *See American Bank & Trust Co. v. Saxon*, 373 F.2d 283, 291 (6th Cir. 1967) (applying Michigan law) (". . . [T]he accomplishment of this good policy [of liberality in branch banking] should be left to the legislative branches of the national and state governments and should not be brought about by executive fiat, with the judiciary withholding legitimate interference.") Some states no doubt have formulated flexible, general standards on the use of branch banks, and the Comptroller perhaps has a greater policymaking role in branch banking decisions under these state laws. *Cf. Hempstead Bank v. Smith*, 540 F.2d 57, 60 (2d Cir. 1976) (applying New York Banking Law § 29 "public convenience and advantage" standard, which is "general and leaves ample room for discretion"). Accordingly, the Comptroller has made certain policy judgments, including a favorable attitude toward increased competition among banks through the use of branches.[4] Indiana, on the other hand, has a statute permitting branches for the purpose of serving areas not already served, but forbidding them as a means of competition between banks. The record points to only one conclusion:

---

4. This policy statement appears at 41 Fed.Reg. 47965 (1976):

> The Office of the Comptroller of the currency . . . encourages a banking structure capable of fulfilling local, regional and national needs for banking services. In the interest of increased competition, service to the public and efficiency, the OCC considers branching a desirable means of bank expansion.

that the Comptroller wished to foster competition in Rensselaer by means of a new branch.

First, because of the physical distance between the main St. Joseph's campus, or "Collegeville," and the branch site, it is difficult to conclude that this branch is "in" Collegeville. No one outside of the Rensselaer city limits lives within a quarter mile of the branch. Instead the branch sits directly on the Rensselaer city limits. From the open space between them that appears in the aerial photos in the record, it is clear that the branch and the main campus of the college do not form a "cluster" of activity.[5] *See Albion National Bank, supra,* 355 N.E.2d at 877.

Second, the record shows that the intent of Remington Bank and the Comptroller was to increase Remington Bank's share of the banking business in Rensselaer. The Primary Service Area (PSA)[6] of the branch extends five miles to the north, south, east, and west, and incorporates the entire town of Rensselaer. According to the testimony of the President of Remington Bank, the PSA contained no other towns or villages, unincorporated or incorporated. The recommendation of the Regional Director of Corporate Activities says that the branch is intended to "secure new business from the Rensselaer market where applicant does not presently have a representative office." In fact the President of the Remington Bank admitted that he was not sure that he would consider the branch viable without the expectation of an increased share of the Rensselaer banking business.

The Comptroller's application of Indiana's home office protection statute in this case renders virtually meaningless the restriction in the statute. There is no evidence in the record of efforts to tailor this branch in size or location to the needs of the college

community as an entity separate from the city of Rensselaer. The branch was sufficiently large that it had to compete for a share of the Rensselaer market if it was to survive. The Comptroller's ruling that this branch was located in "Collegeville" was nothing more than a contrived result to avoid the restrictions of Indiana law. Accordingly, we reverse the judgment of the district court.

---

**5.** We recognize that the athletic facilities of St. Joseph's College are adjacent to the site, but it is not these facilities that serve as the hub of the campus, and they have none of the characteristics of a town. Indeed, St. Joseph's College also farms a number of acres of land in the vicinity of the branch, but the Comptroller does not suggest that this area possesses any of the

attributes of a town, solely because it is a part of the college.

**6.** The PSA is "the smallest area from which the bank expects to draw approximately seventy-five percent of its business." 41 Fed.Reg. 47966 (1976).