600 F.2d 681
 CITY FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff-Appellant,
v.
FEDERAL HOME LOAN BANK BOARD and First Federal Savings &
Loan Association, Defendants-Appellees.
MUTUAL SAVINGS & LOAN ASSOCIATION OF WISCONSIN, Plaintiff-Appellant,
v.
FEDERAL HOME LOAN BANK BOARD et al., Defendants-Appellees.
 Nos. 78-1038, 78-1498.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 2, 1978.
Decided June 21, 1979.
 
 Edward A. Dudek, Milwaukee, Wis., for plaintiff-appellant.
 Harvey Simon, Washington, D. C., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and WHELAN, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 These consolidated appeals are from summary judgments granted in suits challenging two resolutions of the Federal Home Loan Bank Board (FHLBB or Board). Both of the resolutions at issue grant authority to the First Federal Savings and Loan Association of Wisconsin (First Federal) to operate branch facilities in two areas near Milwaukee, Wisconsin. The plaintiff-appellant in No. 78-1038, City Federal Savings and Loan Association (City Federal), challenges FHLBB Resolution No. 75-400, approving the establishment by First Federal of a limited branch facility.[1] The plaintiff-appellant in No. 78-1498, Mutual Savings and Loan Association of Wisconsin (Mutual), challenges FHLBB Resolution No. 72-1161, approving the establishment by First Federal of a regular branch facility. Both plaintiff associations sought declaratory and injunctive relief in the district court. In both actions the district court granted summary judgment in favor of the FHLBB. City Federal Savings and Loan Association v. FHLBB, 441 F.Supp. 89 (E.D.Wis.1977); Community Savings and Loan v. FHLBB, 443 F.Supp. 927 (E.D.Wis.1978).
 
 
 2
 In Appeal No. 78-1038 City Federal raises two major arguments. The first challenges the legality of the Board's limited branch facility regulation, 12 C.F.R. § 545.14(j). The second challenges as arbitrary and capricious the Board resolution authorizing the limited branch facility. In Appeal No. 78-1498 Mutual challenges the Board resolution authorizing the regular branch facility as arbitrary and capricious. An underlying issue is raised concerning the scope of judicial review and the extent of the limitations on that review imposed by the concept of deference to administrative expertise, particularly when the administrative record reflects little more than that a decision has been made and what that decision was. For the reasons explained herein, we do not reach the merits of the arbitrariness issue in either case. Before discussing in detail the issues raised by these appeals we shall summarize the facts of each case.
 
 I. The Facts
 A. No. 78-1038: The Limited Facility Branch
 
 3
 In August 1974, First Federal filed with the Board an application proposing a limited branch facility at a specified location in West Allis, Wisconsin. At the time of this application, the appellant City Federal was operating a regular branch office from temporary trailer quarters 240 feet west of the proposed site. City Federal had opened this office pursuant to Board authority obtained approximately one year prior to First Federal's application. Another plaintiff, West Allis Savings and Loan, which did not join in the present appeals, operated an office 900 feet east of the proposed site. City Federal and West Allis Savings and Loan filed protests with the Board with supporting documents. The Board's Regional Supervisory Agent heard oral arguments.
 
 
 4
 After the oral argument, the Regional Supervisory Agent and the Office of Industry Development (OID) summarized the information compiled in the course of the application proceedings, including the results of a study conducted by the OID to determine the effect of other First Federal branches on nearby savings and loan offices. On April 29, 1975, the Board approved First Federal's application for a limited branch facility.
 
 B. No. 78-1498: The Regular Branch
 
 5
 In June 1968, First Federal filed an application with the Board proposing a regular branch to be located in or near the Mayfair Shopping Center in Wauwatosa, Wisconsin. The application designated a primary service area (PSA)[2] already served by ten other savings and loan associations.
 
 
 6
 Mutual and several other savings and loan associations filed protests. Other associations, although plaintiffs below, did not join in the present appeal. The Regional Supervisory Agent reviewed the application and protests and concluded that the application should be disapproved. The Office of Applications also recommended disapproval. In November 1968, the Board rejected the application. In February 1969, following a request for reconsideration by First Federal, the Board conducted a hearing on the same application, after which the hearing officer and the Office of Applications recommended disapproval. Again the Board rejected the application.
 
 
 7
 A few years later, in February 1972, First Federal filed a new application, again proposing a regular branch in or near the Mayfair Shopping Center. The application was based on a different PSA, this one containing nine other savings and loan offices and having a population of 14,000 fewer people than the PSA for the original application. This time, both the Supervisory Agent and the OID recommended approval. The Board approved the application.
 
 
 8
 We shall discuss other facts in detail as they become pertinent to the issues.
 
 II. The Limited Facilities Regulation
 
 9
 The first argument we consider is City Federal's challenge to 12 C.F.R. § 545.14(j), the FHLBB regulation governing the creation of limited facility branch offices. City Federal argues that it is unlawful because it does not incorporate the restrictions applicable to charters set forth in section 5(e) of the Home Owners' Loan Act of 1933 (HOLA), 12 U.S.C. § 1461 Et seq.
 
 
 10
 Section 5(a) of HOLA, 12 U.S.C. § 1464(a), authorizes the FHLBB to provide for the operation, including the chartering, of federal savings and loan associations, giving primary consideration to the best practices of local institutions.[3] Section 5(e) of HOLA, 12 U.S.C. § 1464(e), sets forth four prerequisites, without which "no charter shall be granted."[4] The prerequisites are: good character on the part of the incorporators, a necessity for the institution in the community, a reasonable probability of usefulness and success, and finally, that the association can be established without undue injury to properly conducted existing local institutions.
 
 
 11
 The FHLBB has promulgated a regulation governing the creation of regular branches which appears at 12 C.F.R. § 545.14(c).[5] This regulation incorporates the prerequisites for charters appearing in section 5(e) of HOLA. The FHLBB has promulgated a different regulation, however, which appears at 12 C.F.R. § 545.14(j), authorizing the approval of "limited facility branch offices" when the Board determines that a branch application does not satisfy in full the community need and probable success requirements for regular branches, but which, "in the opinion of the Board," nevertheless satisfies the requirements "to a degree which would support a limited operation of a branch office."[6] The limited branch facility regulation does not in haec verba include a prohibition against undue injury to existing local institutions which appears in section 5(e) of HOLA and in the regular branch regulation. Nevertheless, in our opinion, a fair reading of the limited branch facility regulation makes it clear that the prohibition in question is also applicable to the limited branch facility. A limited facility is still a branch office and the lessening of the requirements in the regulation pertaining to regular branches is limited to community need and probability of success. We also note that the Board apparently agrees with our construction of the limited branch facility regulation and did in the present case make a specific determination "that the proposed limited facility branch office can be established without undue injury to properly conducted existing local thrift and home-financing institutions."
 
 
 12
 It is well-settled that the Board has power to authorize branch facilities, Bridgeport Federal Savings and Loan Association v. FHLBB, 307 F.2d 580, 584 (3d Cir. 1962), Cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963); North Arlington National Bank v. Kearny Federal Savings and Loan Association, 187 F.2d 564, 565-66 (3d Cir.), Cert. denied, 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617 (1951), Central Savings and Loan Association of Chariton v. FHLBB, 293 F.Supp. 617, 622 (S.D.Iowa 1968), Aff'd, 422 F.2d 504 (8th Cir. 1970), and that the source of this authority is the general grant of powers to the Board in HOLA section 5(a). Central Savings and Loan Association of Chariton v. FHLBB, 422 F.2d 504, 506 (8th Cir. 1970); First National Bank of McKeesport v. First Federal Savings and Loan Association of Homestead, 96 U.S.App.D.C. 194, 225 F.2d 33, 35 (1955); North Arlington, 186 F.2d at 565-66; Lyons Savings and Loan Association v. FHLBB, 377 F.Supp. 11, 16 (N.D.Ill.1974). The language in section 5(a) requiring the Board in the exercise of its powers to give "primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States" limits to some extent the discretion of the Board.[7] This clause of section 5(a) is also, however, an implied grant of authority to the Board to create assorted types of facilities, in accordance with the best local financial practices. See Chariton, 422 F.2d at 506-07. To interpret the section 5(a) powers restrictively would frustrate the purpose of HOLA to create a sound, competitive system of federal home financing institutions. North Arlington, 187 F.2d at 565-66.
 
 
 13
 In accordance with the language of section 5(a) the Board has adopted a general policy (with some exceptions) to permit federal branches and mobile facilities if state law or practice permits them. 12 C.F.R. § 556.5(b)(1). Pursuant to section 5(a) of HOLA and consistent with this policy, the Board has promulgated a number of regulations, including the limited branch facility regulation, providing for many different types of facilities.[8] None of these regulations incorporates all of the restrictive chartering criteria of section 5(e).
 
 
 14
 The need for flexibility and innovation embodied in section 5(a) is not the only reason not to expand the coverage of section 5(e). The language of section 5(e) expressly limits coverage to charters. Furthermore, the charter of a new association involves additional risks not inherent in the expansion of an existing institution. Chariton, 293 F.Supp. at 622. See McKeesport, 96 U.S.App.D.C. at 197, 225 F.2d at 36. We hesitate to create a restriction on the Board's authority in the absence of an unambiguous indication of Congressional intent to do so. In light of the purpose of HOLA merely to supplement state-chartered financial institutions, not to replace them, and in light of the section 5(a) requirement to give primary consideration to the best practices of local financing institutions, however, we tend to doubt whether the Board could lawfully authorize federal facilities without first considering possible injury to existing local institutions. Because, as noted above, the limited facility regulation incorporates this requirement, we do not reach this issue. A different question, of course, would be presented if the Board failed to follow its own regulations' guidelines.
 
 
 15
 The Board seems to argue that it is not required to incorporate any of the chartering criteria of section 5(e) into its branching regulations. Chariton, supra, 293 F.Supp. 617, for example, would seem to support this view. The problem we have here is clearer in the case of the limited facility regulation where there is less than full adherence to the chartering requirements of section 5(e) as contrasted to the regular branch regulation where the adherence is substantial. We must confess some concern with the vagueness of the language of the regulation referring to tests which "in the opinion of the Board, are met to a degree which would support a limited operation of a branch office. . . ." This would seem to border on the situation which John Adams long ago remonstrated against when he referred to a government of law, and not of men, and certainly, in any event could result in a process of circular reasoning. It is true on a strict construction that a branch is not an "institution" and a resolution permitting branching is not a "charter" as specified in section 5(e). On the other hand, leaving the determination of community "necessity," for example, to directionless discretionary opinion could mean that the determination could well vary with every change of the makeup of the membership of the Board. Even though the Congress has not seen fit to prescribe statutory standards applicable to branching,[9] we decline to believe that that body entertained the idea that once an incipient association had gotten over the hurdle of chartering it could spread separate branches throughout its designated banking territory without regard to any of the qualifying prerequisites of section 5(e).[10] Accordingly, it is our opinion that some consideration must be given by the Board to the statutory prerequisites and failure to do so would be a basis for judicial determination that the action of granting branch office permission was arbitrary and capricious and an abuse of discretion.
 
 
 16
 Having said that we again note that despite its disclaimer of obligation, the Board has not abandoned the statutory standards. Directing our attention specifically to the limited branch regulation before us, while we have expressed concern at the vagueness of the language, we do not regard the regulation, as adopted, to exceed the Board's authority. In essence, the regulation, which still requires, as we have said above, a determination that the proposed limited facility branch office be established without undue injury to properly conducted existing local thrift and home-financing institutions, is doing nothing more than to permit a properly chartered institution to do business in a territory which has been allotted to it by that charter. We do not regard the lessening of the stringency of a showing of "necessity and reasonable probability of usefulness and success," as inconsistent with the purposes and language of the statute once it has been established that the association has become legally entitled to do business within the prescribed territory when the granting of the permission will also be subject to limitations as to the scope of the branch facility.
 
 III. Review of the Board Resolutions
 
 17
 City Federal argues that the district court erred in not setting aside the Board resolution authorizing First Federal's limited branch facility. Mutual makes the same argument, challenging the Board resolution authorizing First Federal's regular branch facility.
 
 
 18
 Both Mutual and City Federal argue vigorously that the whole record before the Board should be limited for purposes of judicial review to internal staff memoranda presented to the Board before it decided each case. Neither of these memoranda exceeded twenty pages, and they consisted of a digest of the record and a staff recommendation. Both City Federal and Mutual submitted an affidavit based upon "information and belief" that the Board had read nothing but these memos in each case.
 
 
 19
 The plaintiffs do not question the Board's right to rely only on these summaries. See National Nutritional Foods Ass'n v. FDA, 491 F.2d 1141, 1146 (2d Cir.), Cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). The plaintiffs do argue, however, that the Board's decisions here must be supported by the staff memoranda and that this court may not go to the full record for review.
 
 
 20
 We do not decide this issue, however, because we agree with the trial court in each case that the affidavits submitted were insufficient to rebut the presumption, See id.; Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967), that the Board considered the entire administrative record, consisting of 531 pages in the City Federal case and 382 pages in the Mutual case. Federal Rule of Civil Procedure 56(e), governing summary judgments, requires that an affiant have personal knowledge of the facts alleged in an affidavit. The district courts therefore acted within their discretion in disregarding the affidavits based upon information and belief regardless of the Board's failure to object to the affidavits. See Klingman v. National Indemnity Co., 317 F.2d 850, 854 (7th Cir. 1963).
 
 
 21
 Turning then to the record before the Board we conclude that the reasons for the Board decisions are not explained adequately to permit judicial review at this time in either case. Both decisions of the FHLBB at issue here required complex choices between conflicting policies in the particularly controversial field of branch banking. The history of judicial review of the actions of federal banking authorities, that is, the Comptroller of the Currency and the FHLBB, is therefore marked by extraordinary deference to the technical policy decisions of the agencies in areas where Congressional guidance is slight. See generally Scott, In Quest of Reason: The Licensing Decisions of the Federal Banking Agencies, 42 U.Chi.L.Rev. 299 (1975). In the past, some courts indicated doubt that branching decisions by the Board were subject to review at all. See McKeesport, 96 U.S.App.D.C. 197, 225 F.2d at 36; Bridgeport Federal Savings and Loan v. FHLBB, 199 F.Supp. 410, 413 (E.D.Pa.1961), Aff'd, 307 F.2d 580 (3d Cir. 1962), Cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963). More recently, this willingness to defer to the decisions of the Board has lessened somewhat. In any event, the Board does not deny, and we have no doubt that Board branch authorization decisions are a proper subject for judicial review. The element of judicial deference to agency expertise survives to some extent in the narrow scope of our review, codified in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The reviewing court should set aside an action of the FHLBB only if it is arbitrary, capricious, an abuse of discretion, or not in accordance with the law. Chariton, 422 F.2d at 507; Elm Grove Savings and Loan Association v. FHLBB, 391 F.Supp. 1041, 1042 (E.D.Wis.1975); Lyons Savings and Loan Association, 377 F.Supp. at 21; Benton Savings and Loan Association v. FHLBB, 365 F.Supp. 1103, 1104 (E.D.Ark.1973). See Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (review of national bank charter decision by Comptroller of Currency under § 706(2)(A)); First National Bank of Crown Point v. Camp, 463 F.2d 595, 599 (7th Cir. 1972) (review under § 706(2)(A) of branch bank decision by Comptroller).
 
 
 22
 Section 706(2)(A) embodies a doctrine of judicial restraint. The choice between lawful courses of action is entrusted to the agency, not to the courts. SEC v. Chenery, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); K. Davis, Administrative Law Text § 4.02 at 91 (3d ed. 1972). The court must not substitute its judgment for that of the agency. E. g., Citizens Commission of Georgetown v. Zoning Commission, 155 U.S.App.D.C. 233, 477 F.2d 402, 408 (1973). Thus, it follows that
 
 
 23
 (i)f an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, A judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing (administrative) orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.
 
 
 24
 Chenery, 318 U.S. at 88, 63 S.Ct. at 459 (emphasis added). See, e. g., Sawyer Transport, Inc. v. United States, 565 F.2d 474, 477 (7th Cir. 1977); Secretary of Agriculture v. ICC, 179 U.S.App.D.C. 370, 372, 551 F.2d 1329, 1331 (1977); Contractors Transport Corp. v. United States, 537 F.2d 1160, 1162 (4th Cir. 1976); Citizens Association of Georgetown v. Zoning Commission, 155 U.S.App.D.C. 233, 238-39, 477 F.2d 402, 407-08 (1973). The court cannot properly restrain its review unless the agency gives an adequate explanation of the connection between the record before it and the choice it makes. Dunlop v. Bachowski, 421 U.S. 560, 572-73, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); Bowman Transportation, Inc. v. ArkansasBest Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); Citizens Association of Georgetown, 477 F.2d at 409. The courts do not supply the connecting reasons on review; to do so would result in our fashioning policy and standards for agency action. Bachowski, 421 U.S. at 571, 95 S.Ct. 1851; Camp v. Pitts, 411 U.S. 138, 142-43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419-20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); State of Maine v. Kreps, 563 F.2d 1043, 1051 (1st Cir. 1977); Hempstead Bank v. Smith, 540 F.2d 57, 60 (2d Cir. 1976); Contractors Transport Corp., 537 F.2d at 1162; Kitchens v. Department of the Treasury, 535 F.2d 1197, 1199 (9th Cir. 1976); Central Bank v. Smith, 532 F.2d 37, 40 (7th Cir.), Cert. denied, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976); Citizens Association of Georgetown v. Zoning Commission, 55 U.S.App.D.C. at 238-39, 477 F.2d 402, 407-08 (1973).
 
 
 25
 The more difficult issue is the adequacy of the reasons submitted by an agency in a specific case, when the action is based on informal proceedings. Certainly no precise formula can be prescribed. Our review merely requires an indication of the "grounds and essential facts" for the agency decision. Bachowski, 421 U.S. at 573-74, 95 S.Ct. 1851.[11] Neither the HOLA nor the APA requires the Board to hold an adjudicatory hearing followed by formal findings of fact and conclusions of law for branch applications, nor do the plaintiffs so contend. In permitting judicial review of the Board's decision, however, Congress certainly intended that courts intercede sufficiently to determine that the Board considered the purposes of the HOLA and acted on the basis of some standards.[12] See Bachowski, 421 U.S. at 568-72, 95 S.Ct. 1851 (interpreting the LMRDA); Kitchens, 535 F.2d at 1199. We recognize that the administrative record may show so little controversy that the basis of an agency action is obvious from the record, with no need for an express explanation by the agency. See Camp v. Pitts, 411 U.S. at 143, 93 S.Ct. 1241 (noting that "curt" explanation at least indicated " determinative reason" for agency action); Citizens to Preserve Overton Park,401 U.S. at 420, 91 S.Ct. 814 (explanation necessary because bare record did not disclose factors considered or construction of evidence by Secretary of Transportation). Thus, in light of the varying need for an explanation of agency action, failure to give express reasons for action does not in itself constitute an abuse of discretion. See Central Bank v. Smith, 532 F.2d at 40.
 
 
 26
 In some circumstances, however, the record before an agency shows that significant questions were seriously contested. If the agency decision does not address these issues, even a restrained exercise of judicial review is impossible, and a remand for clarification is necessary. See Central Bank v. Smith, supra, (although Comptroller's explanation "terse" the plaintiff did not show failure to address seriously contested, significant issues); City National Bank v. Smith, 168 U.S.App.D.C. 221, 513 F.2d 479 (1975) (Comptroller need not necessarily address all issues raised during application proceedings; contemporaneous explanation sufficient if it merely neglected to explain minor issue). Although the reasons given on remand will to some extent constitute "post hoc rationalizations" and will for that reason be subject to more critical review, Citizens to Preserve Overton Park, 401 U.S. at 420, 91 S.Ct. 814, they are nevertheless critical to proper judicial restraint.
 
 
 27
 Examined in light of these principles, the Board Resolutions before us are inadequate for judicial review. The records before the Board in these cases show that the protesting parties raised serious questions of banking policy, yet the resolutions representing the Board's determination do not address these issues at all.[13]
 
 
 28
 In the limited facility case, City Federal raised a difficult policy argument pertaining to the issue of community need. The limited branch facility regulation, 12 C.F.R. § 545.14(j), as we have previously noted, requires the applicant to demonstrate some degree of community need. The agency, of course, need not undertake the difficult project of defining this concept by regulation, but the Board must at least articulate on a case-by-case basis what it considers relevant to this issue. City Federal argues that First Federal's only showing on this issue was that it was doing substantial business already in the PSA, and that many people in the area would therefore be more conveniently served with a First Federal facility nearby. The plaintiff argues that reliance on First Federal's penetration in the PSA equates First Federal's convenience with community need. We doubt whether we could uphold a determination of community need on this basis,[14] but we also have no way of knowing that this element of convenience served as the basis of the decision.[15]
 
 
 29
 Mutual also raised this argument in relation to the issue of community need for First Federal's regular branch under 12 C.F.R. § 545.14(c). Unlike the resolution pertaining to the limited facility, the resolution in this case says expressly that the Board considered First Federal's penetration in the PSA. Regardless of the assertions in the Board's brief, however, we do not know what significance the Board attached to this fact, or whether it even was considered relevant to the issue of community need. See Citizens to Preserve Overton Park, 401 U.S. at 420, 91 S.Ct. 814 (the bare record may need explanation when it does not disclose the Secretary's construction of facts).
 
 
 30
 In its brief the Board dismisses as being without merit Mutual's assertion that the arguments advanced to the district court and in this court in support of the resolution were post hoc rationalizations. We feel less certain on this matter than does the Board when we read assertions in the Board's brief that the "Board could reasonably have found" and "Board could have found." Elsewhere in its brief the Board asserts without a tremor of doubt with regard to the claim of undue injury by Mutual that "the establishment of said office could not conceivably cause undue injury to Plaintiffs or any other local savings and loan." Yet just three years prior to the grant of the permission, the hearing officer on reconsideration of First Federal's application was equally tremorless in denying the application:
 
 
 31
 The impact of granting a branch office in the primary service area as delineated by the applicant could only be catastrophic in its effect on numerous associations located therein, which associations are now experiencing very keen competition for savings as well as mortgage loans. The overpowering influence of such a mammoth institution with its resources and advertising media in newspapers, radio, television, outdoor billboards, magazines and direct mail could not be combated by the smaller facilities. The applicant has virtually encircled the whole county with its present branches, only several miles apart from each other and the granting of this branch would make the encirclement complete. The element of need has not been established, not only in light of the ratio of facilities to population as currently exists, but also the applicant's very effective penetration in the immediate area through its existing facilities without a branch. Its contribution as far as servicing the community for home loan needs has not been effective nor was any evidence submitted indicating any more extensive participation than is now offered by the savings and loan associations in the primary service area which is wholly adequate. The testimony in the proceedings firmly establishes beyond any element of doubt, the probability of undue injury to properly conducted existing local thrift and home financing institutions.
 
 
 32
 We are unable to discern any articulation of factors justifying the drastic change of viewpoint. Counsel for the Board in litigation, the district court, and this court may speculate as to why the Board took the action but we do not deem this to be the province of any of us.
 
 
 33
 Even on examination of the rationalizations of counsel and the findings of the district court that there was "some evidence in the record" supporting the Board's finding, we are left with uncertainty unless we make review a token matter. Thus, the district court placed reliance upon the number of savings accounts held by residents of the PSA. Board counsel in their brief here follow up a quotation to this effect from the court's opinion by terming as "settled law" that "a savings and loan association which already has many customers in its proposed service area manifestly has demonstrated a significant need for its proposed branch." The brief then cites for the point Bank of Ozark v. FHLBB, 402 F.Supp. 162 (E.D.Ark.1975). That case, however factually is far distant from the case under consideration. In Ozark, the customers had dealt with the applicant either by mail or by driving 35 miles from Ozark to Ft. Smith. In the case before us, we are concerned with the metropolitan area of Milwaukee where suburban commuterism is a fact of life. We have no way of knowing how many of the residents in the present case were regularly in the main business part of the city where it was easy to conduct transactions with the main First Federal office, but we have little reason to doubt that this did occur, and would continue to occur, notwithstanding the location of a branch near the place of residence which was not the locale of the commuters' daily business activities during normal banking hours.
 
 
 34
 We also note that in considering the earlier application, the Regional Supervisory Agent cited the number of offices in the area (ten) as militating against need. The present application altered the PSA slightly, but there still were nine other savings and loan association offices in the area serving a smaller PSA population. We have not exhausted the indicia of inconsistency presented by the records of the successive application proceedings in the Mutual case. We use these examples to illustrate the need for the Board to elaborate on the differences between the cases. Perhaps the Board has changed its branching policies in the interim. We have no way of knowing whether the Board did this, however, and we must not in the name of "deference" speculate about policy ourselves to explain and affirm the Board's apparently inconsistent action. Perhaps the Board has adhered to the same policies, and certain facts significant to this policy differ materially in each case. The Board did not describe that policy in the previous case, however, and we decline to fashion a principle for the Board's action on the basis of unobvious differences between the two applications. We emphasize that the Board has wide discretion to change its course but at the same time we must require that the Board assure the reviewing court that its former standards are being changed, not ignored. See Greyhound Corp. v. ICC, 179 U.S.App.D.C. 18, 20-22, 551 F.2d 414, 416-18 (1977).
 
 IV. Conclusion
 
 35
 Although the legal foundation for our decision to remand these cases for a statement of reasons is found in the Board's statutory role as policy maker, we would hope that this decision will encourage careful administrative decisionmaking, an important goal even when agency decisions are unreviewable. Dunlop v. Bachowski, 421 U.S. 560, 572, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). We are not convinced that this decision burdens the FHLBB. The record before us shows that the agency staff studied the problems raised by the parties carefully. On the record before us, however, we have no basis to assume that any particular staff memorandum discussing these issues reflects the views of the Board. See Renegotiation Board v. Grumman Engineering Corp., 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). If the Board routinely uses these memoranda as the basis for its decisions, then the Board might easily adopt them as reflecting its reasoning. See K. Davis, Administrative Law Text § 4.04, at 97 (3d ed. 1972). We are not requiring the Board to "justify its exercise of administrative discretion in any particular manner or with artistic refinement." SEC v. Chenery, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).
 
 
 36
 Judicial review will not always require a separate statement of reasons for agency action. We emphasize, however, that courts should not routinely accept agency explanations phrased broadly in terms of the governing statute, "a formal abracadabra to which it has added a few words as a sop to us." To do so would make judicial review as "important as the Statute of Uses which it was said, 'merely added three words to a conveyance.' " Old Colony Bondholders v. New York, N. H. & H. R., 161 F.2d 413, 449 & n.78 (2d Cir. 1947) (Frank, J., dissenting).
 
 
 37
 For the above reasons the judgments are vacated with instructions to the district court to remand the cases to the Board for a clarification of its decisions.
 
 
 
 *
 Senior District Judge Francis C. Whelan of the Central District of California is sitting by designation
 
 
 [1]
 A limited branch facility has restrictions on one or more of the following: number and type of personnel, physical size, capital investment, and extent of activities. 12 C.F.R. § 545.14(j)
 
 
 [2]
 The PSA is the area to be served by the branch office. Generally, it is defined as the smallest geographical area from which the office will draw 75% Of its customers
 
 
 [3]
 Section 5(a) provides:
 Organization authorized
 In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as "Federal Savings and Loan Associations", and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.
 
 
 [4]
 Section 5(e) provides:
 Qualifications of incorporators;
 Selection of localities
 For establishment
 No charter shall be granted except to persons of good character and responsibility, nor unless in the judgment of the Board a necessity exists for such an institution in the community to be served, nor unless there is a reasonable probability of its usefulness and success, nor unless the same can be established without undue injury to properly conducted existing local thrift and home-financing institutions.
 
 
 [5]
 The regular branch regulation provides:
 Application form; supporting information. An application for permission to establish a branch office shall be in form prescribed by the Board. . . . Information shall be furnished in support of the application designed to show: (1) There will be at the time the branch is opened a necessity for the proposed branch office in the community to be served by it; (2) there is a reasonable probability of usefullness (sic) and success of the proposed branch office; and (3) the proposed branch office can be established without undue injury to properly conducted existing local thrift and home-financing institutions. An application shall be deemed to be complete when the foregoing requirements of this paragraph (c) have been met.
 
 
 [6]
 The limited branch facility regulation provides:
 (j) Limited facility branch office
 (1) General. In connection with any application for permission to establish a branch office which the Board has determined does not satisfy in full the requirements of paragraph (c) of this section as to necessity and reasonable probability of usefulness and success, but such tests, in the opinion of the Board, are met to a degree which would support a limited operation of a branch office, the Board may approve the application as a limited facility branch office. Such an office, if approved by the Board, will be subject to limitations imposed by the Board as to one or more of the following:
 (i) Number and type (supervisory, clerical, teller) of personnel to be utilized;
 (ii) Physical size and characteristics;
 (iii) Amount of capital investment by the applicant; and
 (iv) Extent of activities.
 In addition, an applicant for permission to establish a branch office under this section may propose that the office be a limited facility branch office in a case where the applicant believes that the tests in paragraph (c) of this section can be met only to a degree which would support a limited operation of a branch office, and the applicant may propose one or more of the limitations to be imposed by the Board. A limited facility branch office may be advertised to the public as a branch office.
 
 
 [7]
 We do not imply, however, that the FHLBB is required by this clause to follow the law of any particular state in granting authority to operate a branch office. See Chariton, 422 F.2d at 506; Lyons Savings and Loan, 377 F.Supp. at 16-17
 
 
 [8]
 See 12 C.F.R. § 545.14-1 (drive-in and pedestrian facilities); 12 C.F.R. § 545.14-4 (mobile facilities); 12 C.F.R. § 545.14-5 (satellite facilities)
 
 
 [9]
 We are unable to attach any significance to the fact that Congress has not taken legislative action despite having had hearings on the subject of branching. On the one hand, it may have been concluded that the clear language of section 5(e) related only to chartering, in which event Congress intended to entrust the creation of standards for internal expansion of chartered associations to the Board's discretion. Conversely, accepting the testimony of spokesmen for the Board, Congress may well have deemed that the statute already required the agency to treat branches in essentially the same manner as charters. Of course, the third possibility remains that Congress had no intention one way or the other on the matter
 
 
 [10]
 Board spokesmen, in the past at least, have not disagreed with this premise. The plaintiff in its brief has cited several examples, one of which was the testimony of Board Chairman Robertson in 1958 before the House Committee on Banking and Currency:
 The Board will not approve the establishment of a branch by a federal savings and loan association unless in the Board's judgment a necessity exists for such a facility in the community to be served, nor unless there is a reasonable probability of its usefulness and success, nor unless the same can be established without undue injury to properly conducted existing local thrift and home-financing institutions.
 
 
 [11]
 The requirement of reasons under HOLA which we discuss here is not identical to the requirement of the APA, appearing in 5 U.S.C. § 555(e). This section of the APA requires a "brief statement of the grounds of denial" of a written application, petition, or other request of an interested person in agency proceedings. The statement required by the APA may or may not satisfy the review requirements of HOLA, depending upon the circumstances of the case. See Bachowski, 421 U.S. at 573, 95 S.Ct. at 1861 (noting that a letter from the Secretary of Labor declining to bring a civil suit under 29 U.S.C. § 482(b) satisfied 5 U.S.C. § 555(e) but "did not suffice as a statement of reasons required by the LMRDA")
 
 
 [12]
 By mentioning "standards" we do not imply that the Board is not free to make reasoned changes in its policies. We merely require that when the Board does so, it indicates that the old policy is being changed, not ignored. Greyhound Corp. v. ICC, 179 U.S.App.D.C. 18, 20, 551 F.2d 414, 416 (1977)
 
 
 [13]
 Board Resolution No. 75-400, authorizing the limited facility branch, is in pertinent part only a conclusory statement that the criteria recited in 12 C.F.R. § 545.14(j) had been met:
 WHEREAS, it is determined by the Board that although said application does not fully satisfy the regulatory requirements of paragraph (c) of Federal Regulation 545.14 as to necessity and reasonable probability of usefulness and success, it meets such requirements to a degree which would support a limited operation of a branch office, and it is further determined that the proposed limited facility branch office can be established without undue injury to properly conducted existing local thrift and home-financing institutions. . . .
 Board Resolution No. 72-1161, authorizing the regular branch facility, is slightly longer but no more helpful. It mentions some facts but gives this court no idea of how these facts relate to the conclusion:
 WHEREAS, the Board has determined that a necessity exists for the proposed branch office in the community to be served, that there is a reasonable probability of its usefulness and success, and that said branch can be established at such locality without undue injury to the protestants and any other properly conducted existing local thrift and home-financing institutions; and
 WHEREAS, in making the determination referred to above, the Board has considered all relevant matters including, among others, the following: (1) the size, population, composition, rate of growth, new housing starts, income level, savings potential and lending needs of the proposed service area, (2) the number of existing local thrift and home-financing institutions already serving the area, (3) the size, location and rate of growth of the protestants, and other local thrift and home-financing institutions in or near the service area, (4) the distance between First Federal's proposed branch office and the nearby offices of the protestants, and the size and rate of growth of the protestants located closest to the proposed branch office, (5) the necessity for another local thrift and home-financing institution to be located in, or near, the Mayfair Shopping Center, the number of existing institutions now located in, or near, the Center, and the potential usefulness, convenience and benefit of First Federal's proposed branch office to the shoppers and employees of the Center, and (6) the very substantial amount of existing savings and mortgage loans of First Federal arising out of the proposed service area; and
 WHEREAS, the record in this cause contains sufficient information to enable the Board to make the necessary determinations with respect to the above-mentioned matters; and
 WHEREAS, a principal objection of the protestants to the approval of the proposed branch office is that the establishment of such branch allegedly would be anti-competitive and/or monopolistic; and
 WHEREAS, the Board is of the view that the restraints of the antitrust laws are not applicable to the present situation which involves internal and not external expansion, and that even if such laws are deemed to be applicable, the establishment of the proposed branch would not be violative of law because: (1) the addition of the new branch would enhance, rather than lessen, competition in the relevant area; and (2) the new branch would not result in a monopoly or a restraint of trade in light of the very substantial existing competition provided by the protestants (and particularly the protestant located closest to First Federal's proposed branch which is among the largest savings and loan associations in Wisconsin), and the other institutions in or near the service area. . . .
 
 
 [14]
 The record contains evidence that First Federal, the largest of the insured savings and loan associations in the Milwaukee area, engaged in aggressive advertising throughout the area. It seems that the practice of authorizing a branch facility on the basis of the expansion inevitably following this sort of exposure would permit the largest association in the area to grow disproportionately to those less able to invest large sums in advertising. See Hempstead Bank v. Smith, 540 F.2d 57 (2d Cir. 1976) (remanding for reasons for Comptroller's approval of Chase Manhattan branch under New York's "public convenience" standard because of question whether Chase Manhattan's convenience was improperly equated with public convenience). Perhaps the Board considered this possibility and had a valid reason for disregarding it. The Resolution, however, gives us no guidance on this issue
 
 
 [15]
 In this limited facility case, the OID conducted a survey of the effect of thirteen other First Federal offices on competing offices within a one-mile radius and recommended approval of the facility. City Federal argues that the survey was done secretly and that the Board's failure to let plaintiff respond to the survey was in violation of Board regulations giving parties to the application notice and an opportunity to be heard. See 12 C.F.R. § 545.14(g). We do not believe that the OID, which has the right to request additional information from other persons, 12 C.F.R. § 556.5(a)(2), acted inconsistently with the informal procedures described in the regulations. The plaintiff had no right to cross-examination or confrontation under the regulations and therefore cannot complain that it was not informed of all the evidence. See Merchants & Planters Bank of Newport v. Smith, 380 F.Supp. 354, 363 (E.D.Ark.1974) (involving procedures of the Comptroller of the Currency)