**HOWARD SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**The FEDERAL HOME LOAN BANK BOARD, and St. Paul Federal Savings and Loan Association, Defendants.**

**No. 80 C 418.**

United States District Court, N. D. Illinois, E. D.

Oct. 10, 1980.

William S. Grotefeld, Ruff & Grotefeld, Chicago, Ill., for plaintiff.

Harvey Simon, John E. Gunther, Paul W. Grace, Federal Home Loan Bank Board, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

In this case, plaintiff, Howard Savings and Loan Association ("Howard"), seeks declaratory relief to set aside a resolution of defendant, the Federal Home Loan Bank Board ("FHLBB" or "Board"), which approved the application of St. Paul Federal Savings and Loan Association ("St. Paul Federal") to open a branch banking facility at or near the intersection of Howard

Street and Western Avenue in Chicago, Illinois. Currently before the Court are the Board's motion for summary judgment and Howard's cross–motion for summary judgment on Counts II and III of the complaint. After an examination of the briefs and the administrative record, the Court has concluded that the case is ripe for summary adjudication. Accordingly, for the reasons set forth below, defendant's motion for summary judgment is granted, and plaintiff's motion is denied.

In January of 1979, St. Paul Federal, one of the larger savings and loan associations in the Chicago metropolitan area filed an application with the FHLBB[1] to establish an additional branch facility. This proposed office was to be located either directly across the street or in the immediate vicinity of Howard's sole facility in Chicago. The application included rather detailed statements designed to satisfy the standards established by the Board for approving new branch facilities.[2] Information was provided concerning the past and present lending practices of St. Paul along with a projected financial statement for the proposed branch. The application also included detailed data that defined and described the primary market area (PMA) to be served by the branch office. Demographic and economic statistics regarding this community, its need for and its ability to support an additional facility were submitted.

Upon receiving notice of St. Paul Federal's application, the Niles Savings and Loan Association and Howard filed written protests with the Board.[3] Howard and Niles

---

1. The FHLBB is an independent agency of the United States established by the Federal Home Owner's Loan Act of 1933 ("HOLA"), as amended, 12 U.S.C. § 1461 *et seq.* Section 5(a) of the HOLA, 12 U.S.C. § 1464(a), delegates to the board the authority to provide for the operation and chartering of federal savings and loan associations.

2. Pursuant to federal regulations, the Board is authorized to approve branch applications upon a showing of:
 (1) A necessity for the proposed branch in the community to be served by it at the time

it is opened; (2) the branch has a reasonable probability of success; (3) the branch can be established without undue injury to properly conducted existing local thrift and home–financing institutions; and (4) applicant's performance in helping to meet the credit needs of its existing local communities.
 12 C.F.R. § 545.14(c).

3. Niles Savings and Loan Association participated throughout the administrative proceedings in protesting the application of St. Paul Federal, but has not joined with Howard as a party to the present civil action.

vigorously challenged the data submitted by St. Paul Federal. In opposition to the application, both Niles and Howard claimed that the PMA was already adequately serviced, that the branch proposed by St. Paul Federal was not economically viable and that an additional St. Paul office could not be established in the PMA without causing undue injury to existing savings and loan institutions.

Both Howard's and Niles' protests were considered "substantial" by the Board and in accordance with its regulations, 12 C.F.R. §§ 545.14(e), 542.2(f), oral argument was heard before the FHLBB's Supervisory Agent on May 11, 1979. All three of the aforementioned savings and loan associations participated in the hearing. On November 29, 1979 the FHLBB adopted Resolution No. 79–598, which approved St. Paul Federal's application. In pertinent part, the Resolution provided:

> [I]t is determined, based upon the reasons set forth in the attached Summary of Bank Board Findings, that a necessity exists for such a branch office, that there is a reasonable probability of its useful-

ness and success, and that it can be established without undue injury to properly conducted existing local thrift and home–financing institutions . . . .

In order to comply with the holding of the Seventh Circuit in *City Federal Savings & Loan Ass'n. v. FHLBB*, 600 F.2d 681 (7th Cir. 1979) (hereinafter *"City Federal"*), the Board also issued a summary of Bank Board Findings [4] (which is set forth in full below) in conjunction with this Resolution.

Howard instituted this action in January, 1980. Howard has alleged that it was denied due process in the approval of the St. Paul Federal application for the following reasons: (1) the Board failed to articulate a rational basis for its determinations that there was a necessity for a new St. Paul Federal branch office and that this could be established without undue injury to Howard; (2) that the Board's determination of no undue injury exceeds the Board's statutory right and authority; and (3) the Board violated its own regulations in adjudicating an incomplete application for a branch office.[5] Stripped of their formalism, how-

---

4. In connection with its resolution the Board issued the following Summary of Findings:

 a. Financial institutions within the PMA have experienced successful savings growth. Two of the three thrift offices located in the PMA filed substantial protests of this application, Howard Savings and Loan Association (home office) and Niles Savings and Loan Association (branch office). Savings at the Howard Savings and Loan increased $1.4 million, or 4.9% during the twelve months ended September 30, 1978. Niles Savings and Loan Association, a branch office which opened in the fall of 1978, reported savings of $2.1 million, as of March 31, 1979. The third association in the PMA reported a savings increase of $12.3 million or 38.7% for the twelve months ended September 30, 1978. The addition of another office of a thrift institution will increase the savings and loan competition and provide area residents with an alternative source with which to conduct their business.

 b. There is a reasonable probability that applicant's proposed office will be successful because the applicant is intending to establish itself in a PMA with a high median family income of $20,598, and a good population base of 79,187. It proposes to establish its office in a good location with easy accessibility and has already penetrated the PMA with

 savings of $4.8 million and mortgages of $5.4 million from area residents.

 c. The possibility of undue injury is minimal. The population per savings and loan facility will be good (19,796:1) and the income levels of the resident population are sufficient to justify the addition of another thrift office into the area. The two open S & L offices in the PMA had savings increase by 62.24% from September 1976 to September 1977, and 22.61% for the year ending September 1978.

 d. St. Paul Federal has the managerial and financial capabilities to support this expansion effort.

 e. The applicant's community service record is satisfactory. St. Paul's CRA statement indicates that it has made an effort to meet all its local credit needs, and there are no indications in any Board records of discrimination or consumer complaints.

5. In its complaint, Howard alleged that the FHLBB erred both in considering St. Paul Federal's application which was allegedly incomplete and erroneous, and that the Board failed to articulate sufficient reasons to demonstrate the necessity of a new branch office. Since Howard has failed to brief these points in opposition to summary judgment, it is not clear

ever, the allegations raise two points. First, Howard claims that the Board disregarded the statutory and regulatory requirement that there be a finding of no "undue injury" when it concluded in the Summary of Findings that "the possibility of undue injury is minimal." Second, because the Board determined the undue injury question by examining the *aggregate* growth in net worth and savings for all savings and loan institutions in the PMA instead of evaluating the record of each savings and loan individually, according to Howard the FHLBB acted arbitrarily and capriciously.

■ The Court begins its inquiry by noting that judicial review of FHLBB branch banking decisions is quite circumscribed. This and other circuits have recognized that § 5(a) of the HOLA is a broad congressional delegation of authority to the Board to regulate the savings and loan industry in general and to approve branch banking applications in particular. *City Federal*, 600 F.2d at 685; *Bridgeport Federal Savings and Loan Ass'n v. FHLBB*, 307 F.2d 580 (3d Cir. 1962). The federal courts have also acknowledged that the determination as to the necessity or justification for new branches of thrift institutions "calls for highly specialized knowledge, and sensitive almost intuitive judgment . . . ." *Bridgeport Federal Savings & Loan Ass'n v. FHLBB*, 199 F.Supp. 410, 413 (E.D.Pa.1961). Given the Board's broad discretion and the sensitivity of these issues, it is well settled that a reviewing court's inquiry is limited to a determination of whether the Board's decision was arbitrary, capricious or otherwise

whether they have been abandoned. In any event, neither of these allegations is tenable. In paragraph (a) of the Summary of Findings, the Board sufficiently articulated the necessity for the new office. The administrative record more than supports the Board's findings. In addition, *St. Paul Federal's application com-plied* with the requirements of 12 C.F.R. § 545.-14(c) and the conclusion of the Board's Supervisory Agent that the application was complete was not unreasonable. Finally, assuming there were any errors or misstatements in the application, Howard was provided ample opportunity to rebut these facts in its written protest to the Board and in oral argument.

not in accordance with the law. *City Federal*, 600 F.2d at 688; *Lyons Federal Savings & Loan Ass'n v. FHLBB*, 377 F.Supp. 11 (N.D.Ill.1975); *Winnetka Savings & Loan Ass'n v. FHLBB*, No. 73–C–2820 (N.D. Ill., filed January 22, 1975). Phrased in slightly different terms, this Court must uphold the Board's determination so long as some rational basis for it exists in the administrative record. *Winnetka Savings & Loan Ass'n. v. FHLBB, supra; Elm Grove Federal Savings & Loan Ass'n v. FHLBB*, 391 F.Supp. 1041 (E.D.Wis.1975); *Guarantee Federal Savings & Loan Ass'n v. FHLBB*, 330 F.Supp. 470 (D.D.C.1971).

Turning to Howard's arguments, it is apparent that they both have their genesis in paragraph (c) of the Board's Summary of Findings which provides:

The possibility of undue injury is minimal. The population per savings and loan facility will be good (19,796:1) and the income levels of the resident population are sufficient to justify the addition of another thrift office in the area. The two open S & L offices in the PMA had savings increase by 62.24% from September 1976 to September 1977, and 22.62% for the year ending September 1978.

In contrast to the Summary, the FHLBB concluded in its Resolution that the new St. Paul office could be established "without undue injury" to the existing thrift institutions.

Implicit in Howard's first argument (*i. e.*, its objection to the Board's statement that the possibility of injury was "minimal"), is Howard's misunderstanding of the function and significance of the Board's Summary.[6]

6. The Court is a bit skeptical as to how seriously Howard takes its own argument. In its Memorandum in Opposition to Summary Judgment, Howard objects to the Board's use of the phrase, "the possibility of undue injury is minimal," yet states that it would not be objectionable for the FHLBB to conclude that the possibility of undue injury is "negligible." To this Court, the difference between the two conclusions is merely a semantic and not a substantive matter.

The Summary provided here is the Board's response to the Seventh Circuit's recent opinion in *City Federal Savings & Loan Ass'n. v. FHLBB*, 600 F.2d 681 (7th Cir. 1979). The problem presented to the Court of Appeals in *City Federal* was that the reviewing court, supplied only with a copy of the administrative record and a conclusory FHLBB resolution which merely echoed the regulatory standards for approving a branch application, was in no position to determine, as required by § 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), whether the Board's action was arbitrary or capricious. As expressed by the Seventh Circuit, "The court cannot properly restrain its review unless the agency gives an adequate explanation of the connection between the record before it and the choice it makes." *City Federal*, 600 F.2d at 688, citing, *Dunlop v. Bachowski*, 421 U.S. 560, 572–73, 95 S.Ct. 1851, 1860–1861, 44 L.Ed.2d 377 (1975).

Accordingly, the Court of Appeals concluded that judicial review under § 706(2)(A) requires that the agency provide some explanation of the connection between the administrative record and its determination. In this Court's view, however, the panel did not intend to restrict the ability of a district court to review the entire administrative record nor did it establish the Board's Summary as a talismanic statement which preempts all other inquiries. Indeed, the Court noted in *City Federal* that in some instances an explanation by the Board would be unnecessary and in other instances a simple curt statement would suffice. *City Federal*, 600 F.2d at 689, citing, *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

 Once the Summary of Findings is viewed in its proper perspective, Howard's arguments lose whatever force they might have had. More significant than the Board's statement by way of explanation that the possibility of undue injury was minimal is its conclusion in the Resolution that the proposed St. Paul Federal office could be established without undue injury to existing thrift institutions. Most significant of all is that the administrative record, as explained by the Summary, evinces a rational basis for the FHLBB's decision.

The evidence before the Board indicated that the PMA, as defined by St. Paul Federal and not challenged by the contestants, had a sufficient population to savings and loan ratio (19,796:1) to support an additional office. In addition, demographic studies were introduced which indicated that the projected growth in the number of households within the PMA and the median income of these households mitigated against any undue injury resulting from the approval of the application. Most important, perhaps, is that the financial data provided to the FHLBB although challenged, was sufficient to indicate that all of the existing thrift institutions had sufficient financial strength to survive any difficulties which might be created by the addition of a competitor. The evidence showed that during the three years prior to St. Paul Federal's application, the existing S & L's averaged a 67% increase in total assets and a 43% increase in savings deposits. Excluding the newly opened office of Niles Federal, savings between the two facilities open for the calendar year ending September 1978 experienced a growth in savings of 22.61%.

The evidence regarding Howard Savings, in particular, indicated that Howard had experienced a growth in total assets from about $19 million in 1974 to $34 million in 1977. Howard's net worth more than doubled between 1974 and 1978. Finally, although statistics were offered indicating that Howard had suffered a decline in savings of 3.3% for the first four months of 1979 (*i. e.*, the most recent data then available to the FHLBB), testimony also illustrated that this decline was caused by a general downturn in the national economy and/or by management decisions of Howard Savings. On the basis of this record, it was quite rational for the Board to conclude (even considering Howard's current difficulties) that the financial status of the existing savings and loans, along with the projected growth of the PMA, indicated that an additional facility could be established without undue injury.

This Court also is unpersuaded that the Board acted improperly or irrationally by considering the aggregate growth of the pre–existing S & L's in the PMA. First, the Court disagrees with the basic premise which underlies Howard's claim—that the FHLBB only considered the potential injury in the aggregate and did not examine Howard's situation individually. Even limiting the review to the Board's Summary as Howard suggests, the first paragraph of the Summary sets out individualized growth and profit statistics for Howard Savings. This indicates, along with the presumption that the entire record was reviewed by the Board, *Braniff Airways, Inc. v. CAB*, 379 F.2d 453 (D.C.Cir. 1967), that Howard's individual circumstances were taken into account below.

Even assuming Howard's position to be factually sound, there is more fundamental flaw in plaintiff's argument. The crux of Howard's claim is that the Court should require the Board to use a specific methodology in evaluating the undue injury criterion. Regardless of whatever merit such an analysis might have, it is not the prerogative of the Court to so deeply intervene in the Board's decision making process.

The Board's decision to employ aggregate financial statistics instead of an individualized comparison is no different in substance from hundreds of judgments that the Board must make in evaluating every branch application. Such decisions call for technical expertise which is possessed by the Board and not this Court. If the Court were to intervene here by directing the Board to apply an individualized standard, it is impossible to see how the Court could then restrain itself in other instances. For example, if, as Howard suggests, the Board is prohibited from basing its decision on the data of more than one savings and loan institution, then is it also prohibited from grounding its determinations on the data from more than one year? Similarly, should the FHLBB be permitted to consider the increase in the amount of savings deposits over the course of one year, or must the inquiry be confined to increases or decreases in total assets?

Of course, the answer to all of these questions is that none of these specific inquiries can or should be mandated by the courts. Rather, decisions of this type are committed to the Board, which can then exercise its particular expertise to make these judgments. All that this Court can require is that the Board's judgment be rational—and the decision to employ aggregate rather than individual data meets this standard here. As noted above, evidence was submitted that supported the conclusion that Howard's individual financial records may have been skewed by management decisions peculiar to this institution. As such, the combined financial data may have been a more accurate barometer of the ability of existing savings and loans to absorb additional competition without undue injury. It was therefore, not irrational for the Board to consider this evidence.