739 F.2d 258
 NEKOOSA PAPER, INC., Thilmany Pulp and Paper Company,
Mosinee Paper Corp., and Consolidated Papers,
Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, Respondent,
The Atchison, Topeka and Santa Fe Railway Co., et al.,
Intervening Respondents.
 No. 83-1069.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 6, 1984.
Decided July 12, 1984.
 
 John H. Lederer, DeWitt, Sundby, Huggett & Schumacher, Madison, Wis., for petitioners.
 Timm L. Abendroth, I.C.C., Washington, D.C., for respondent.
 Before PELL and ESCHBACH, Circuit Judges, and BARTELS, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 This case comes to us on a petition for review of an administratively final order of the Interstate Commerce Commission (ICC) which upheld over challenges of unreasonableness the rail rates charged by intervening respondent carriers to transport pulpwood and wood chips to petitioners' mills in Wisconsin. At issue on appeal is whether the ICC adequately explained its decision when it found the assailed rates reasonable under the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1898.
 
 I. FACTS
 
 2
 Petitioners in this case are manufacturers of paper and paper products with major manufacturing facilities located in Wisconsin. All purchase substantial quantities of pulpwood and wood chips from which they derive the wood fibers necessary to produce a broad palette of paper products. Petitioners require both hardwood and softwood fibers, the relative mix of these fibers determining the characteristics of the final product. Shifts in consumer demand for certain paper products have resulted in large requirements for softwood fibers, requirements in excess of those which can be satisfied by softwood sources in Wisconsin. Petitioners have been forced to look to neighboring states and beyond for sources of softwood fiber, and they have found such sources in Idaho, Montana, Wyoming, Colorado, South Dakota, Minnesota, and Michigan. Because of the bulk and relative low value of pulpwood and wood chips, rail transportation is the method of choice for shipping these commodities from source locations to the Wisconsin mills. Petitioners contend that the intervening respondent carriers dominate the rail shipment routes between sources in the near western states and the mills in Wisconsin.
 
 
 3
 In a complaint filed in February 1981, petitioners requested that the ICC find rail rates for pulpwood and wood chips shipments on intervening respondents' lines unreasonably high in violation of 49 U.S.C. Sec. 10701a. The assailed rates are those published in Western Trunk Lines and Transcontinental Freight Associates tariff schedules. The schedules have been in effect since prior to 1977 and have been subject to several general and special increases.
 
 
 4
 In proceedings before an Administrative Law Judge (ALJ) of the ICC, petitioners presented a cost study, a market impact study, and verified statements of the mills' employees responsible for wood fiber purchases. The central point of petitioners' presentation was that the intervening respondent railroads had established rates at high levels resulting in severe anticompetitive effects on the wood fiber industry. According to petitioners' evidence, the pertinent carriers began in 1974 to raise their western rates at a pace vastly faster than the pace at which lake state carriers had increased their rates. The western rail rates resulted in a revenue/variable cost ratio for representative rail movements of 198 percent (later revised to 185 percent). A revenue/variable cost ratio of 170 percent, petitioners maintained, would be reasonable. According to the verified statements of petitioners' employees, the overall rates charged by the intervening respondents for the transportation of pulpwood and wood chips placed petitioners at a serious competitive disadvantage relative to manufacturers located closer to western softwood sources. Petitioners' employees also maintained that the rapid increase in western rates relative to lake state rates diminished competition between the two groups of suppliers.
 
 
 5
 Intervening respondents presented a cost study and verified statements of marketing representatives employed by the railroads. This evidence suggested that there were substantial intermodal competition for the transportation of pulpwood and wood chips and that petitioners' cost studies understated the railroads' costs. If the cost studies were done correctly, the railroads maintained, the actual revenue/variable cost ratio would be only 143 percent.
 
 
 6
 In his decision, the ALJ found each party's computation of the revenue/variable cost ratio for representative movements to be flawed. The ALJ nevertheless found convincing petitioners' evidence concerning the absence of intermodal and geographic competition for the transportation of the wood commodities. On the basis of this evidence, he found "no effective competitive constraints on the abuse of market power by the railroad defendants with regard to the subject traffic." He therefore concluded that intervening respondents had market dominance and invoked the jurisdiction of the ICC to determine if the assailed rates exceeded a reasonable maximum. See 49 U.S.C. Sec. 10709.
 
 
 7
 The ALJ's discussion of the reasonableness of the rates was terse. On the issue of the anticompetitive effects of the western rail rates, the ALJ maintained that differential pricing, the practice of setting rates on some lines above fully allocated costs in order to achieve fully allocated costs overall, is generally sanctioned by the ICC. As to petitioners' claim that reasonable rates would be those resulting in a revenue/variable cost ratio of 170 percent, the ALJ stated that petitioners had offered no precedent or explanation for the adoption of that ratio as the standard of reasonableness. These two points, together with the fact that the parties' revenue/variable cost data was inclusive, led the ALJ to reject petitioners' complaint. On administrative review, the ICC Review Board received recalculated cost evidence submitted by petitioners, but determined that the new evidence did not warrant departure from the conclusions reached by the ALJ.
 
 II. DISCUSSION
 
 8
 Judicial review of administrative decisions is essential to the legitimacy of the administrative process. See Saylor v. United States Department of Agriculture, 723 F.2d 581, 582 (7th Cir.1983). In particular, review assures that an agency correctly applies to the record before it the decisional rules framed by the political branches of government. Requisite to effective review of administrative decisions, however, is a clear articulation by the agency of the rules it applied to reach the decision it rendered. See City Federal Savings & Loan Association v. Federal Home Loan Bank Board, 600 F.2d 681, 688 (7th Cir.1979). In the instant case, we believe the ICC foreclosed effective judicial review by failing to articulate the standard of reasonableness it applied when it ruled against petitioners.
 
 
 9
 Congress passed the Staggers Rail Act of 1980 in response to declining railroad earnings which were already "the lowest of any transportation mode and ... insufficient to generate funds for necessary capital improvements." H.R.Rep. No. 96-1430, 96th Cong., 2d Sess. 79 (1980) U.S.Code Cong. & Admin.News 1980, pp. 3978, 4111. In order to avoid "further deterioration of the rail system or the need for additional Federal subsidy," id., Congress sharply limited the power of the ICC to alter rates as set by the carriers themselves. See 49 U.S.C. Sec. 10709(b), (d). Congress moreover directed that in those cases where the ICC does have the power to review rail rates set by the carriers, the ICC must "recognize the policy of this title that rail carriers shall earn adequate revenues." See 49 U.S.C. Sec. 10701a(b)(3). The Staggers Rail Act, however, did not eliminate the concern that certain rail carriers could abuse their position of market dominance over captive traffic. While the purpose of financial rescue in the Staggers Act was deemed necessary by Congress, and is not to be condemned considering the financial disasters suffered by rail carriers in recent years, it should not be forgotten that more stringent regulation originally came about through a what-the-traffic-would-bear attitude on the part of the early rail barons. The lessons of history should not be ignored.
 
 
 10
 When a carrier fails to show that its revenue/variable cost ratio for transportation to which an assailed rate applies is below 170 percent and the ICC finds the carrier has market dominance, then the ICC must determine whether the assailed carrier rates are "reasonable." See 49 U.S.C. Secs. 10709(b), (d)(2), (d)(4), 10701a(b)(3). In the instant case it is undisputed that the ICC was obliged to determine whether the assailed rates were reasonable. The case therefore afforded the ICC an opportunity to set definitive standards for determining the reasonableness of railroad rates in light of the Staggers Rail Act's emphasis on revenue adequacy. In our opinion the ICC should have set out the precise elements that a party challenging a rate as unreasonable must establish in order to prevail. The ICC should then have catalogued the evidence offered by petitioners and explained why that evidence was or was not sufficient to establish the elements of unreasonableness. Alternatively, the ICC could have rejected petitioners' complaint after identifying one element of an unreasonableness showing as crucial and explaining why petitioners' evidence failed to establish that vital element. The ICC, however, took neither approach, and it thereby precluded effective judicial review.
 
 
 11
 The shortcomings of the principal argument advanced by the ICC to reject petitioners' complaint illustrate the difficulty we faced when we reviewed the ICC decisions. Petitioners offered evidence that the carriers had increased their western rail rates at a pace vastly faster than that at which the rates for the transportation of wood commodities from nearby sources had risen. The ICC summarized petitioners' position as an attack on the differential pricing method and then stated that the ICC recognizes differential pricing as a valuable tool in assisting railroads toward revenue adequacy. The disposition of petitioners' case by stating that rates based on differential pricing are not per se illegal is hardly an adjudication open to judicial review. It was incumbent upon the ICC to identify the limits to the use of the differential pricing method. If petitioners failed to show that the railroads exceeded those limits, then the rejection of petitioners' complaint would have been based on a ground susceptible to meaningful review. The opinions handed down by the ICC lack any such identifiable ground. After reading the ICC's opinions, one is at a loss to state what evidence petitioners should have introduced in order successfully to challenge the assailed rates.
 
 
 12
 It is possible that the ICC believes any rail rate automatically is reasonable as long as it is the result of a differential pricing strategy. If this is the ICC's position, then it should state so in plain terms. That position would at least be open to effective review.
 
 
 13
 We are mindful of the fact that the ALJ found petitioners' revenue/variable cost data to be inconclusive. The ALJ did know, however, that the average revenue/variable cost ratio for the pertinent transportation fell between 198 percent (petitioners' figure) and 143 percent (railroads' figure). It is possible that the ICC considers accurate revenue/variable cost data to be crucial to a reasonableness determination. If the ICC believed the uncertainty in the party's data meant petitioners could not possibly prevail, then it should have articulated that reasoning in clear terms. Again, such a decision would at least have been open to meaningful review. Before we can say whether the ICC followed the mandate committed to it by Congress, we must know with certainty the ground on which it acted.[1]
 
 
 14
 In light of the foregoing analysis, a remand of this case to the ICC for further proceedings consistent with this opinion is appropriate.[2] See Saylor, supra, at 584. Although an agency such as the ICC is accorded a good deal of deference by the courts because it is a "permanent expert body," see Atchison, T. & S.F. Ry. v. Wichita Board of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973), we cannot absolve the ICC of its duty to explain cogently the basis for its decisions, see Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., --- U.S. ----, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983). The ICC's improvised analysis in this case lacks the cogency to which we can accord deference. Accordingly, the decision of the ICC is vacated and the case is remanded to the ICC for further proceedings consistent with this opinion.
 
 
 15
 VACATED AND REMANDED.
 
 
 
 *
 Senior District Judge John R. Bartels, Eastern District of New York, is sitting by designation
 
 
 [1]
 Petitioners contended before the ICC that a maximum reasonable rate would be one resulting in a revenue/variable cost ratio of 170%. We agree with the ICC that petitioners failed to support this contention. The mere fact, however, that petitioners failed to justify their proposed rate does not necessarily mean that they lose their case. The ICC must cogently explain why petitioners' other evidence is or is not sufficient to establish unreasonableness
 
 
 [2]
 One paper manufacturer, Thilmany, presented evidence showing that intervening-respondent carrier, Chicago & North Western Transportation Company, had granted it an allowance for use of rail cars privately owned by Thilmany of only 1.5 cents per mile. In contrast, the Wisconsin Transportation Commission awarded Thilmany 13.3 cents per mile on intrastate movements. The Review Board addressed the issue as follows: "Complainants' evidence fails to demonstrate that the assailed rates exceed a maximum reasonable level, whether those rates apply to movements in railroad owned cars or in the private cars of complainant Thilmany." Here also the Review Board gave no explanation for its conclusion. The Review Board then suggested that Thilmany bring a complaint pursuant to 49 U.S.C. Sec. 10747. If, on remand, the ICC relegates Thilmany to an action under Section 10747 because Thilmany has failed to prove the assailed rates unreasonable, then the ICC must articulate the standard it employs to determine reasonableness